BENJAMIN S. LIDDON ET AL., APPELLANTS, VS. HARTWELL HODNETT, APPELLEE.

1. The record in the volume kept for that purpose at the General Land Office at Washington, of a patent for land executed in the manner prescribed by law, or a lawful exemplification of such record, is evidence of the same dignity as the patent itself.

2. The statutory provisions in force November 1, 1830, and prescribing the manner in which a patent of the United States for land should be signed and countersigned, required that it should be signed by the President and countersigned by the Commissioner of the General Land Office.

3. The act of March 3, 1843, (sec. 2470 of U. S. Revised Statutes,) provides that literal exemplifications of any records shall be deemed of the same validity in all proceedings, whether in law or equity, wherein such exemplifications are adduced in evidence, as if the names of the officers signing and countersigning the same had been fully inserted in such record: Held, That the record to prove a valid patent must show the signing and countersigning by the above officers, but the names need not have been fully inserted in the record; if partially inserted in the record it will be presumed that they fully appear in the patent.

4. An exemplification of the record of a patent under the above act of March 3, 1843, was offered in evidence. The concluding portion

of the record as shown by the exemplified copy is as follows : "In testimony whereof, I, Andrew Jackson, President of the United States of America, have caused these letters to be made patent and the seal of the General Land Office to be hereunto affixed. Given under my hand at the city of Washington, the first day of November, * * * 1830. * * † By the President, *A. J.* "*E. H.*, Commissioner of the General Land Office."

Its admission in evidence was objected to because there was no testimony that the original of such patent was signed, or that there was any omission to sign the record, and the objection was sustained. Held to be error, and that the court should have taken judicial notice of who were President of the United States and Commissioner of the General Land Office at the date of the patent ; and that the initials of their names appearing on the record was presumptive evidence that they appeared in full in the patent.

5. Exemplifications of records of the General Land Office, under the hand of the Commissioner thereof and the seal of the office, are admissible in evidence in the courts of this State, independent of legislation in aid thereof.

6. Where the United States has sold and patented land according to the official plat of a previous survey, a subsequent survey making a different location of the land called for by the descriptive numbers in the patent, does not affect the location of the land patented. Any sale made by the patentee or his successors, either before or after the second survey, and describing the land by numbers, is presumptively according to the original survey.

7. Where, in an action of ejectment, each party's claim of title to the land is upon the the theory and assumption that the United States has parted with the title thereto, but no patent or other record evidence thereof is introduced, and the question is when, or according to which one of two surveys, made about twenty-five years apart, the government sold, an ancient deed, conveying part of the land, and to the genuineness of which there was no objection, had been introduced in evidence, subject to the jury's determination as to whether the grantee and one of the subscribing witnesses were the same person, it was error in the Circuit Judge, in charging the jury to exclude the deed from the consideration of the jury because the party introduc-

Benjamin S. Liddon et al. v. Hartwell Hodnett—Statement of Case.

ing it had not connected his title with it. If the jury believed that the grantee had not subscribed as one of the two witnesses, the deed was admissible to be considered, with the other evidence of acts of private ownership of the land, as to when or according to which survey the land was sold.

8. In cases of mistake as to the true line between adjoining lands, the real test as to whether or not a title will be acquired by a holding for the period of seven years is the intention of the person holding beyond the true line. If such occupation is by mere mistake, and with no intention upon the part of the occupant to claim, as his own, land which does not really belong to him, but he intends to claim only to the line, wherever it may be, the holding is not adverse. If, however, the occupant takes possession, believing the land to be his own up to the mistaken line, and claiming title to it, and so holds, the holding is adverse. The intent to claim title up to the line is an indispensable element of adverse holding; the claim of right must be as broad as the possession. Simple acquiescence in, or lying by without objection, for the statutory period, in case of such adverse holding, will bind the party so lying by to the line, though not the true line.

9. Where, looking at the whole testimony, the clear effect of it is contrary to the verdict, a new trial will be granted.

10. Possession need not be undisputed to be adverse.

11. Where possession is proved to be adverse to the true owner, and there is nothing in the testimony to show that the possession has not been held in right of the person holding or claiming adversely, it is not necessary for such person to prove that he claimed to hold "against the whole world."

Appeal from the Circuit Court for Jackson county.

The action is ejectment for the recovery of certain tracts and parcels of land in the above county, viz: " Thirty acres of land, being a strip or parcel of land being situated and extending across from north to south two hundred and twenty yards wide from the western boundary of the following sub-divisions of sections, namely : the SE quarter of sec. 20, and NW quarter of NE quarter of sec. 29, all of T. 3, R. 7, and also all the land west of, contiguous to, and

adjoining said sub-divisions of sections, and which, until during the month of January, A. D. 1884, was enclosed by a fence on the western side of the field upon the place known as the Larkin Davis place, and which, until during said month, was in the possession of plaintiffs and occupied by plaintiff, Francis B. Liddon."

The defendant pleaded not guilty. The other facts are stated in the opinion.

*Liddon & Carter* for Appellants.

*John W. Malone* for Appellee.

Mr. Justice Raney delivered the opinion of the court:

This is an action of ejectment instituted by Benj. S. Liddon, Francis B. Liddon and Thomas B. Liddon, appellants, in Jackson Circuit Court in July, 1884. There was a verdict for the defendant, and judgment having been entered thereon the plaintiffs appealed.

I. The first alleged error is the refusal of the Circuit Judge to admit in evidence certain certified copies of patents from the General Land Office of the United States offered by plaintiffs.

Upon the trial the plaintiffs read to the jury without objection a deed dated October 12, 1877, from Isaac H. Stone to Benjamin S. Liddon, conveying in fee the NW ¼ of the NE ¼ of sec. 29, T. 3, R. 7, N and W, and a deed dated May 21, 1881, from William L. Davis to Benjamin S. Liddon and the other plaintiffs conveying the SE ¼ of section 20, T. 3, R. 7, N and W, and a deed dated July 10, 1884, from B. S. Liddon to the other plaintiffs, and each of them, for an undivided third interest in the said NW ¼ of NE ¼ of section 29. F. B. Liddon, one of the plaintiffs, then testified

in their behalf that he had made diligent search for the original patents to the lands claimed by the plaintiffs, that W. L. Davis, the grantor above named, was dead, that witness went to the house of his heirs and asked them for the patents, they looked for the papers and brought witness a lot which they said were all they had, and he looked carefully among them but there were no patents; he "only found the old deed from W. S. Stone to H. D. Stone," referred to hereafter. The plaintiffs then offered in evidence the two certified copies of patents, and they were objected to because there was no evidence before the court that the originals of such patents were signed or that there was any omission to sign the record. The objection was sustained, and the copies were excluded. To this ruling the plaintiffs excepted. These copies of patents are each from the United States to Jeremiah Loftin, his heirs and assigns. One recites that he has deposited in the General Land Office of the United States a certificate of the Register of the Land Office at Tallahassee, whereby it appears that full payment has been made by him according to the provisions of the act of Congress of April 24, 1820, (giving its title) for the west half of the SE $\frac{1}{4}$ of section 20, in T. 3, N, R. 7, W, in the district of lands offered for sale at Tallahassee, in the Territory of Florida, according to the official plat of the survey of said land returned to the General Land Office, which said tract has been purchased by the said Loftin, and grants the said lands to Loftin and his heirs. The other has the same recitals and is to the same effect except that it is for the W $\frac{1}{2}$ of the NE $\frac{1}{4}$ of sec. 29, in the same township and range. The one is based on Certificate No. 2885 and the other on Certificate 2887. Each bears the same date, *November 1, 1830.* The conclusion of each is as follows: " In testimony whereof, I, Andrew Jackson, President of the United States of America, have caused these

letters to be made patent and the seal of the General Land Office to be hereunto affixed.   Given under my hand at the City of Washington the first day of November in the year of our Lord one thousand eight hundred and thirty, and of the independence of the United States the fifty-fifth.

" By the President, *A. J.*
" *E. H.*, Commissioner of the General Land Office."

One patent appears from the exemplification to have been " recorded, vol. 7, page 297," and the other in the same volume, p. 299.

The certificate to one of these copies so offered in the evidence is by L. Harrison, Acting Commissioner of the General Land Office, under date of March 18, 1885, and the other is by W. A. Sparks, Commissioner of the General Land Office, under date of May 5, 1885, and each certifies under the seal of the office that the annexed copy of patent in favor of Jeremiah Loftin, founded on Tallahassee, Florida, cash entry, (giving number as above,) " is a true and literal exemplification from the record in this office.  The record of the patent in this case was omitted to be signed as required by law, but section 2470, revised statutes of the United States, provides that literal exemplifications of any records which have been or may be granted   *   *   *   shall be deemed of the same validity in all proceedings, whether in law or in equity, wherein such exemplifications are adduced in evidence, as if the names of the officers signing and countersigning the same had been fully inserted in such record."

In addition to said section 2470 it is provided by section 891, Rev. Stats. U. S., (sec. 7, act July 4, 1836,) that copies of any records, books or papers in the General Land Office, authenticated by the seal and certified by the commissioners, shall . be evidence equally with the originals thereof and (act March 3, 1843,) literal exemplifications of any such records shall be held, when so introduced in evi-

dence, to be of the same validity as if the names of the officers signing and countersigning the same had been fully inserted in such record, and by section 2469, R. S., it is made the duty of the commissioner to certify such copies as may be applied for to be used in evidence in courts of justice. In a case like the one before us a patent is the instrument which passes the title of the United States to the land it covers. The legislation of the general government has prescribed the manner in which a patent shall be executed, and these provisions are held by the Supreme Court in such cases to be mandatory. The act in force November 1, 1830, the date of the alleged patents to Loftin, provided that they should be under the seal of the General Land Office and be signed by the President of the United States, and countersigned by the Commissioner of the General Land Office. Act of April 25, 1812, chap. 68, sec. 8, p. 717, Vol. 2, U. S. Statutes at large. Legislation subsequent to November 1st, 1830, provides that the President's signature might be made by a private secretary, and that the countersigning should be by the Recorder of the General Land Office. Sec. 6, p. 111, and sec. 2, p. 417, Vol. 5, U. S. Stats. The patent is, in a case like this, where the government has been the owner of the land, the grant itself; (McGarrahan vs. Mining Co., 96 U. S., 316; Langdeau vs. Haynes, 21 Wall, 521,) and the record of the patent in the land office, though it is not the grant itself, is, under the statutes, evidence of the grant. The purpose of such record, if intended at all as constructive notice, was not intended for notice alone, but also for the preservation of evidence of the grant, preservation of the contents and form of the grant, or to show that an instrument such as is there copied has been prepared for issue. The record is evidence, of equal dignity with the patent, or the grant, because it is a copy of the patent and has been made by

law, " evidence equally with the originals thereof." The same defects as to contents or signatures which, if appearing on the face of the patent would invalidate the grant, will, barring the effect of the act of 1843, it appearing on the face of the record, have a like effect on the grant.

Signing and countersigning · are essentials and the absence of either appearing, either upon the patent if it is adduced, or upon the record if it, or a transcript therefrom, is alone relied upon to show the grant, will be fatal. It was not the purpose of the act of March 3, 1843, (secs. 891 and 2470, Rev. Stats.) to do away with either.· " The record to prove a valid patent must still show that these provisions of law were complied with." McGarrahan vs. Mining Co., *supra.* The evident occasion of the act of 1843 was that there had been *in recording patents* omissions to enter in *full* the names of the officers signing or countersigning, but neither the occasion nor the purpose of the act seems to have been to cure any defect in the original patent, or that any such defects were within the contemplation of the law makers. They were dealing·with defective records of valid patents. Dealing thus, it would seem that when they said· that literal exemplification * * shall " be deemed and held to be of the same validity in all proceedings whether in law or in equity, * * as if the names of the officers signing or countersigning * * had been fully inserted in such record," they meant that where there was an imperfect entry of a signature. that it should not impair the effect of the record or exemplification as evidence of the grant. " The names," says Chief-Justice Waite, " need not be fully inserted in the record, but it must appear in some form that the names were actually sig..ed to the patent when it issued. If they are partially inserted in the record it will be pre-

sumed that they fully appeared in the patent, but no such presumption will be raised if no signature is shown by the record." We do not perceive, nor is it contended, that the imperfect record could not be legalized to the extent it has been by this statute. Sinclair vs. Learned, 51 Mich., 335, 345 ; City of Jacksonville vs. Basnett, 20 Fla., 525.

Is there such a partial insertion of the names of the President and the Commissioner of the General Land Office in the record, as shown by the exemplification before us, as enables us to presume that they appeared in full in the original patents? We take judicial notice of the fact that Andrew Jackson was President of the United States on November 1st, 1830, the date of the patents in question. His name appears as such in the body of the alleged patents. The letters *A. J.* are unquestionably the initials of the name Andrew Jackson. We take moreover judicial notice that at this time Elijah Hayward was Commissioner of the General Land Office. 1st Greenleaf on Evidence, §§6, 479, 503; Mangum vs. Webster, 7 Gill, 78; Burrow vs. Brown, 59 Texas, 457 ; Himmelman vs. Hoadley, 44 Cal., 213 ; People vs. John, 22 Mich., 461. There is no officer whose official acts are more intimately connected with the property rights of the people of this country than the Commissioner of the General Land Office. *E. H.* are the initials of the name Elijah Hayward. These initials of the President and the Commissioner appear in the record as stated by the exemplification. The purpose of the statute of 1843 was to cure cases of defective records.

The assumption that these initials are an imperfect recording of the full names for which they stand is not only consistent with common sense and within the occasion calling for the enactment of the statute, but the contrary of this assumption presumes that the record is a fraud, and that the recording officer instead of doing imperfectly his

duty in recording patents which had been duly signed, re-corded fraudulent patents which had never been signed at all, or, if we say that *A. J.* and *E. H.* do not stand for the names suggested, that patents signed by others, wrongfully assuming such high offices, were put upon record.

The objection that there was no evidence before the court showing either that the originals of such patent were signed, or that there was an omission to sign the record, is not tenable. The exemplification before us is, in view of what it contains and the statute authorizing its admission as testimony, *prima facie* evidence of the former, and con-clusive evidence of the latter fact so far as a recording of the names in full is concerned. The presumption made by the exemplification as to the former will stand until overcome by proper proof. As against these objections we think the papers were admissible and that the Judge erred in excluding them.

The exemplifications from the General Land Office con-sidered apart from their effect were clearly admissible in evidence, independent of any legislation in this State, upon the doctrine of Doe vs. Ree, 13 Fla., 602, and Sim-mons vs. Spratt, 20 Fla., 495 ; Greenleaf's Ev., §§483, 484. See also Barton vs. Murraine, 27 Mo., 237 ; Patterson vs. Winn, 5 Peters, 233 ; Gregory vs. McPherson, 13 Cal., 562.

II. The second assignment of error is the admission of a certified copy of a survey, T. 3, N, R. 7, W, made in De-cember, 1850, by Henry Wells, Deputy Surveyor, and ap-proved January 28, 1852, by B. A. Putnam, then U. S. Surveyor-General for the District of Florida. Upon the face of this survey it appears that: " The unfinished part of the traverse of the lake was surveyed ; and the follow-ing section lines : S and E lines of sec. 2, S and E of sec. 3, S and E of sec. 4, S and E of sec. 9, and all west of the

west boundaries of sections 4, 9, 16, 21, 28 and 23, including their west boundaries, were *resurveyed* in the month of December, 1850, by Henry Wells, Deputy Surveyor." The copy is a literal exemplification certified by the Commissioner of the General Land Office.

The objection over which it was admitted, was that "the survey was not made in accordance with the laws of the United States in such cases made and provided."

Our views as to this objection and the ruling thereon will be set forth at the foot of the 5th paragraph of this opinion.

III. The third error assigned is that portion of the charge excluding from the consideration of the jury a deed dated July 26, 1843, and purporting to be from Wm. D. to *Hannah D.* Stone, conveying the SE¼ of sec. 20, in the district of lands offered for sale by the United States at Tallahassee.

The deed is signed by both parties with their initials and one of the signatures of the two is " *H. D.* Stone." It was objected to on the ground that the witness and grantee appeared to be the same person. The judge decided that it ought to go to the jury, and if they should find upon inspection that the witness and grantee were the same person then it should not be considered in evidence, but that otherwise it should be. Subsequently in charging the jury the judge instructed them as follows: " This deed has been admitted in evidence with defendant's consent subject to your determination as to whether the H. D. Stone who signs it as a witness is the same H. D. Stone who signs it as grantee. If it should appear to you from inspection of the deed that the grantee, H. D. Stone, and the witness, H. D. Stone, are one and the same person, then you are not to consider this at all; but upon consideration, as it is not claimed by the plaintiffs that there is any other deed in

their chain of title connecting plaintiffs with the grantee in this deed, I withdraw it entirely from your consideration and you will ignore it in making up your verdict."

It is a fact that the grantor and grantee both appear to have signed the deed as parties thereto.

The mere fact, *under the circumstances of this case*, that the surname and initials of one of the witnesses are the same as those of the grantee is not of itself *prima facie* evidence that the grantee was the person who subscribed as a witness. Bennett vs. Lebhart, 27 Mich, 489. If, however, the signatures appeared to be in the same hand-writing or there was anything else upon the face of the deed tending to show that the same person signed the two signatures, it was a question for the jury to decide whether or not the grantee did subscribe as a witness. Parol evidence would have been admissible to prove that he did so sign, and testimony could have been used to show that the signatures were in the same hand-writing. If, however, it had been stated upon the face of the instrument that he did so sign, the court could properly have excluded the deed.

If no objection was made to the genuineness of the deed, we think it should have been left to the consideration of the jury, (if they believed from the appearance of the signatures that the grantee was not one of the witnesses) as a circumstance evidencing the fact that title had passed from the United States before the approval of the Wells survey. In the absence of the exemplification of the patents it was a circumstance to be considered with the other testimony of acts of private ownership of the land as to when title did pass or which survey controlled, neither party denying that the title was out of the government. It was, of course, not evidence that the title had passed from the government. With the exemplification in evidence the exclusion of this ancient document would have been imma-

terial, and its introduction unnecessary if not improper, but in view of the fact that the copies of patents were excluded we think it was a circumstance showing the exercise of private ownership at its date. It was over forty years old and found in the possession of the heirs of the grantor of the plaintiffs of the land in section 20.

IV. The fourth error assigned is to the charge: "Unless the plaintiffs' deeds, or some of them, are of a date anterior to the approval of the survey of 1852, made by Henry Wells, then the survey by Henry Wells will bind the parties to this suit as to the location of the divisions of subdivisions of sections of land mentioned in the declaration."

This is not the entire paragraph of the charge upon this subject. A part of the last sentence is omitted, to-wit: the words " unless they connect their title to one prior to that survey." These words follow after the word " declaration."

If the United States sold these lands prior to the approved survey by Wells then the sale must have been according to the Hays and Drake survey. Upon such assumption, the location is controlled by the Hays and Drake survey, and if there is any difference between it and the Wells survey the latter does not define the land really sold. Johnson vs. Jones, 1 Blk., 210; Slack vs. Orillion, 13 La., 56; s. c., 33 Am. Dec., 551. Assuming a sale by the United States prior to the Wells survey then any conveyance by the immediate grantee of the U. S. or his successors, whether made before or after the Wells survey, is presumptively according to the Hays and Drake survey, unless the conveyance is expressly according to the Wells survey. Any other construction would, as these surveys differ in the manner indicated in a subsequent paragraph, lead to the entirely illogical result of the original grantee or some one of the successive grantees conveying

land varying in its location from that conveyed to him. The theory of this suit admits the title to be out of the United States; the defendant, as well as the plaintiffs, claims legal title to the land in controversy. Neither one relies solely upon mere possessory title. Our conclusion is that the charge is upon an erroneous theory and should not have been given.

V. The fifth assignment of error is upon the following charge: " On the question of acquiescence in boundaries I charge you that it must not be a simple acquiescence or lying by without objection for the statutory period of seven years, but such an active acquiescence as will amount to an agreement. By this I mean that mere passive acquiescence is not sufficient to bind a party to a boundary line claimed by another."

In Doggett vs. Wiley, 6 Fla., 482, it was held that where parties having an interest in a common boundary, as owners of grants adjoining agree to a dividing line, and especially where a town is laid out by commissioners predicated on such agreement, and the property is held thereunder for a great number of years, this is *conclusive* as against them and *those holding under them,* and parol testimony is good and admissible to prove such agreement. The facts were that upon laying out the present city of Jacksonville about 1824 a discussion or controversy arose between Brady, the owner of the Maestre Grant, and Hart, owner of another, as to where the dividing boundary was, and it was finally settled by agreement as running from a certain tree on the St. Johns river; whereupon the commissioners proceeded to lay off the town, Brady and Hart each giving half of Market street and the former's lands lying on the one side and those of the latter on the other side of the street. Parol testimony was used in proof of the discussion and agreement. See also Jackson vs. Dysling, 2 Caines' Repts., 198.

There is no other decision of this court upon this question.

The cases relied upon by the appellee are Morse vs. Churchill, 41 Vermont, 649 ; Worcester vs. Lord, 56 . Me., 265 ; Howard vs. Reedy, 29 Ga., 152 ; Gates vs. Butler, 3 Humph., 447 ; Grube vs. Wells, 34 Iowa, 148 ; Church vs. Burghardt, 8 Pick., 328 ; Brown vs. Cockerell, 33 Ala., 45.

In Morse vs. Churchill, an action of trespass *quare clausum fregit*, joining owners having a well defined and recognized straight line between their lands built together a zigzag slash fence wherever they could build the cheapest and easiest, following rocks and ledges where they could do so and not pretending to build on the true line, it was held that possession to such zigzag slash fence would not be available to either owner to gain title beyond the true line ; nor to their grantees, except under a claim of ownership. That the presumption that possession was adverse may be rebutted by proof that in its origin it was permissive ; and that sometimes the condition of the property and the circumstances accompanying the occupancy itself will rebut the presumption that it was adverse or under a claim of right. There being a rail fence on a portion of the true line and the zigzag slash fence diverging in places from the true line, apparently for convenience only, it was held that a referee or jury trying the case might properly infer, under the circumstances of the case, that occupancy between the straight true line and the slash fence was not under claim of title. " For a distance of 60 or 70 rods the rail fence on the true straight line would indicate," says the court, " that the adjoining proprietors claimed only to that line through the whole distance of the adjoining lands."

The case of Worcester vs. Lord is similar in principle to

the above, and the fence was where the controversy arose a "brush or lop fence." It was held that it was not the intention of their statute to make the " possession, occupation and improvement " therein described *conclusive* evidence of *disseisin* and a bar to the true right of the owner, but only " sufficient " evidence of the adverse interest of the party holding it, in the absence of other testimony establishing its true nature ; and what evidence will overcome such " sufficient " evidence and establish the true character of the possession, is discussed.   Dow vs. McKinney, 64 Me., 138.

The ruling in Howard vs. Reedy, as stated in the headnote, is that a possession originating in and continued under a mistake or misapprehension as to the true line which divides two lots of lands will not ripen into a statutory title. It is said of the defendant, in the opinion, "he never did claim title to but one-half of the lot.  On the contrary, after he bought he recognized the paramount title of Reedy. He agreed, when he reset his fence, to put it upon the true line, and ascribed to his overseer the fault of failing to do so."  Verdict for the plaintiff, Reedy, was sustained, as there was " proof sufficient to sustain " it.

In Gates vs. Butler, the opinion upon this point is as follows : The proof made it clear as to possession of part of the land for more than seven years, that it was not the purpose and the intention of the plaintiff to take or keep possession of any of the land in controversy ; that the fence supposed to include some of it was intended by the plaintiff, or by those under whom he claimed, to be placed on the boundary, and was believed by parties to be upon said line.  The proof made it most probable that it was in fact upon the partition line.  Under these circumstances the court charged that the accidental and unintentional enclosure of a small part of the land for seven years would not vest a valid title in the owner of the inferior grant so

as to enable him to recover against those claiming under the superior grant, and judgment was affirmed.

In Grube vs. Wells, the doctrine held is that the statute of limitations is not available as a defense in an action of right, unless the defendant has held possession of the land for the statutory period under color of title or claim of right; that mere possession is not sufficient. The *quo animo* or intention with which the possession was taken and held by the defendant is an essential consideration. It must be shown that he intended to hold in hostility to the true owner. The facts relied upon to constitute adverse possession cannot be presumed, but must, in all cases, be strictly proved. The claim of right must be as broad as the possession and hence where a defendant's claim is limited to a lot of a certain number, but his possession extended to and covered a part of an adjacent lot embraced in his enclosure, it was held that this did not amount to an adverse possession of the latter. A mere belief that the lot which defendant claimed extended to the limits of the enclosure, is not equivalent to a claim of title or right, and therefore not sufficient to constitute adverse possession. Defendant's enclosure was of twenty-five years standing, and she and her grantee had had actual possession for this period, and plaintiff's lot had been unenclosed most of this time. The verdict for the plaintiff was sustained.

In Church vs. Burghardt, the parties were in possession of adjoining lots under different titles. The dividing line which was first laid out in 1734, was a straight line. A crooked fence was erected more than fifty-eight years before the trial and included on the Burghardt side a part of the other lot; but the owners of the two lots occupied respectively up to this fence for more than thirty years. The plaintiff recently had erected a fence on the straight line, which the defendant tore down. The action was trespass

*quare clausum fregit*, and the question was whether evidence of acts and declaration of the parties since the expiration of the thirty years was admissible to show that the old fence was built for mutual accommodation without any view to title, and that the occupation was not adverse, and it was held that they were admissible to show the nature of the occupancy and rebut the presumption of adverse possession. There was, however, judgment according to the verdict.

In Brown vs. Cockerell, it was held that if two coterminous proprietors of land agree upon a dividing line and jointly construct a dividing fence in accordance with that agreement, and occupy up to that fence, their possession is adverse to each other, and, if continued for the time prescribed by the statute of limitations, ripens into a perfect title; but where a dividing fence is run beyond the true line, whether from inadvertence, ignorance or convenience on the part of the owner, and with no intention to claim up to it as the dividing line, his possession is not adverse to the adjoining proprietor, nor can it, when accompanied by acts of ownership and continued for the statutory period, perfect title as against such adjoining proprietor; and that where a title has once vested by adverse possession in one of the adjoining proprietors it will not be divested by a subsequent parol agreement to have their boundary line surveyed, but such agreement is a matter for the consideration of the jury in determining the question of adverse possession. "It," says the opinion, "a party occupies land up to a certain fence, because he believes it to be the line, but having no intention to claim up to the fence if it should be beyond the line, an indispensable element of adverse possession is wanting. The intent to claim does not exist, and the claim which is set up is upon the condition that the fence is upon the line. Or if the fence is put

over the line from mere convenience, the occupation and exercise of ownership are without claim of title and the possession could not be adverse." In the same opinion, after stating that where two coterminous proprietors build by consent a fence as a dividing line between them and occupy up to it, the intention to claim would be manifest and the possession adverse, it is said : " The law would be the same if one of the coterminous proprietors should build a fence as the dividing fence, and should occupy with a claim manifested by words or acts, that such was the line up to which his land extended."

There is nothing in these authorities, cited by counsel for appellee, to sustain the view that simple or passive acquiescence is not sufficient. The fact that there may have been in any of these cases an agreement or affirmative acts upon plaintiff's part amounting to an agreement does not establish that there must be an express agreement or such affirmative acts in all cases. These cases are valuable as showing what must be the nature or character, and purpose or intent, of the occupancy acquiesced in. The intention of the occupant to claim title or to claim adversely is made, as in the above cases cited for appellee, the crucial test by other authorities, of the result of his holding in case of mistake as to the true dividing line. In Missouri it is held that possession by adjoining proprietors of land up to what they both erroneously supposed to be the true dividing line between them, with no intention on the part of either to claim beyond the true line, will not work a disseisin in favor of either proprietor of the land so erroneously occupied by him ; (Houx vs. Balteen, 68 Mo., 84,) and in Wellbrum vs. Ballen, ibid, 164, that if one takes possession of land of another, believing it and claiming it to be his own, his possession is adverse; and that it is only where he occupies by mistake and with no intention

of claiming anything that does not belong to him, that it is not adverse; and in Tanner vs. Kellog, 49 Mo., it is said * * *. There can be no disseisin without intention, and in this case without claim of title, and the question is whether the party in possession only intends to hold to the true line, wherever it may be, or whether he makes his claim and intends to hold to the specific line that bounds his possession. The mere fact that he claims that line to be the true one cannot negative the intention and make him hold, if mistaken, under the opposing claimant; although in the absence of evidence of intention to hold adversely the presumption would be that he designed to hold only to the true line. See also Turner vs. Baker, 64 Mo., 218. In Abbott vs. Abbott, 51 Me., it is said that " mere occupation by inadvertence or mistake without any *intention* to claim title may not be a disseisin; as where a fence is erroneously erected on the dividing line. 31 Me., 345; 3 Greenleaf, 126. But if in such case there is an intention *to claim title* to the land occupied, though the line is fixed by mistake, it is a disseisin. 20 Me., 205; 8 Cowen, 439; 25 Ver., 316. * * The intention which is necessary is an intention to claim title." * " If the occupation is not accompanied by a claim of title, in fact, but is merely an inadvertence or mistake as to the extent of the land without intention to claim to the extent of the occupation, but only to the bounds described in his deed, then there is no bar, but on the contrary if he does claim title of the land occupied he is entitled to hold it. Hitchins vs. Morrison, 72 Me., 381. Where S. received a deed for a lot of land, but took possession of an adjoining lot claiming it as his own, and that possession was continued by him and his successors, with that claim, for more than twenty years, it was held that such possession had ripened into a title, though it appeared that there was a mistake either in the deed or the

taking possession. Ricker vs. Hubbard, 73 Me., 105. "The true question is whether Hubbard, when he took possession of that lot, intended to hold it as his own, and against all persons. The intention is the test, and not the mistake."

We do not understand the declaration to claim any land west of the point at which the fence was in January, 1884, at the time the appellee entered and moved it eastward. According to the testimony it was then about where Allen had located the Hays and Drake line in 1881. Hodnett had moved the fence eastward in 1881 to such point and there it remained until January, 1884, when he again moved it about 220 yards further eastward. Hence the decision of the question of title by adverse holding as to the land between the location of the Hays and Drake line by Grace, and its location by Allen, as indicated by the location of the fence as it stood from 1881 till it was moved in January, 1884, before it was last moved, is not really before us.

Really the facts of the case do not present the question of the true location of a single survey line. This is apparent from a consideration of the testimony.

It is clear that according to the Hayes and Drake survey the dividing line between the east and west halves of the two sections, 20 and 29, lies near the old fence row, up to which the predecessors of the plaintiffs and those of the defendant occupied and cultivated for over ten years or more anterior to the making of the Wells survey, and its approval by the Surveyor-General of the United States, for the district of Florida. Grace and Allen who as County Surveyors ran the line after the purchase by one or both of the parties to this action, located it near this fence, when acting on the former survey. On the other hand, when acting on the Wells survey, each of them located about 220

yards east of their former location.   In view of this testimony there is no room then for an assertion that according to the former survey the line is at the place that the defendant claims it to be, or that according to the Wells survey it is nearer the old fence.   The real controversy then is not one of the proper location of a line according to a single survey, nor of acquiescence in an acknowledged erroneous location upon a single survey and the effect of a continuance of such acquiescence for a long period of time.

The difference of location is accounted for by a difference in the width, from east to west, of the western tier of sections in the township, according to the two surveys. According to the map of the Hays and Drake survey these sections were laid off 80 chains wide, or a few links less, but Wells made them 90 and 40 links, or 88 chains and 76 links, or some intervening number of chains and links wide. His field notes show that he *retraced* the west boundary of section 31 north from the southwest corner of the township.   If he retraced it then he must have run on the west boundary line of the township as it was located and run by Hays and Drake, and have started at the southwest corner of the township as located by them, and hence the initial point of the two surveys was the same.   These field notes also show that he ran the west boundaries of secs. 19, 18, 7, running north from their southwest corners, and of sec. 6, running south from the northwest corner. These six sections are all in the western tier of sections and the field-notes, besides relating solely to these sections, are the field-notes of their western boundary only.   The platt of the Wells survey shows, however, the excessive width alluded to above by giving the chains and links mentioned, and in the table of contents on the two maps, or plats, a corresponding excess of land is shown to be in the western tier of sections.   As Wells, in making his sur-

vey, began at the point where Hays and Drake had located the southwest corner of the township, and, as he made these of the increased width in the western sections, the east line of said sections, which is the west line of sections 20 and 29, must, as located by him, fall about ten chains or 220 yards east of their east line as located by Hays and Drake, and consequently the east boundary line of secs. 20 and 29, and half section lines running through them, north and south, such two sections being about 80 links wide according to both surveys, must, also, according to the Wells survey, fall about ten chains east of similar lines on the Hays and Drake survey. There is nothing to show that any sale of the parts of sections 20 and 29, in controversy, or of any part of said sections, according to the Wells survey, has ever been made by the United States. The patents which were excluded, in their recitals refer to plats of survey which must be the Hays and Drake survey ; no other survey appears to have been made prior to the date of the patents as shown by the exemplifications. The defendant did not attempt to show that title had passed from the United States since the Wells survey or its approval. The testimony clearly shows that long before this the ancestors of both the grantors of the defendant and the plaintiffs were in possession claiming ownership, and no one pretends or can, consistently with the nature of the case, claim that title is in the United States. The effect of the testimony admitted on the trial is in favor of the proposition that the title passed from the United States prior to the Wells survey, and we think that upon it, and independent of the exclusion of the exemplifications of the record of the patents, the verdict should have been for the plaintiffs.

Referring to the objections stated in the 4th paragraph of this opinion as to the legality of the Wells survey,

though we are not apprised why the western tier of sections should have been made so wide, and not 80 chains or a mile wide as required by the act of Congress, (sec. 2395, Rev. Stats., U. S.,) yet we do not think it proper to pass upon the legality of the survey, but are of the opinion that if the United States sold according to the Hays and Drake survey, the Wells survey is not admissible as evidence to affect or change the lines or location of the land so sold.

VI. The Circuit Judge also charged : " But the plaintiffs claim that, independent of the surveys and deeds, they should have a prescriptive title to the land. As to this I charge you that if the plaintiffs have occupied and held for seven years, prior to the taking by the defendant, open, adverse and undisputed possession of the land claimed by them up to the old fence or fence row as claimed by them, this claim is good, but not good unless such holding was claimed to be adverse, not only to the defendant but as to the whole world."

We do not know that the Circuit Judge meant to say that possession must be *undisputed* in the sense counsel for appellant has attributed to the word in his argument. It rather seems that the Judge was referring to the fact that the appellants claimed to have been in open, adverse and undisputed possession instead of instructing that it was essential that the possession should be undisputed. Of course the mere fact that it was disputed made the possession none the less adverse. On the contrary, where a holding is otherwise of such character as to give title under the statute, when continued for the prescribed period, disputes or controversy had pending the running of such period as to the possession or right of possession, and in which disputes or controversy the occupant has consistently claimed and maintained his right of possession, would seem to make

30

more open and notorious the adversary character of such possession. Of course the possession must be uninterrupted during the period in which the owner of the legal title must bring his action to save himself against the statutory bar.

As to the latter part of the above charge our view is that when the possession is shown to have been held by one adversely in law to the owner of the legal title, and there is nothing in the testimony to show that the possession so claimed to constitute a statutory title has not been in the right of the person so holding, the effect of the testimony is that the holding is in law that of such person actually in possession and is exclusive of the legal title, and it is not necessary for such person to prove affirmatively or otherwise that he claimed to hold against the whole world. The charge was calculated to mislead the jury.

We do not think it necessary to pass upon the other questions.

The judgment is reversed and a new trial granted.