122 So.2d 445 (1960)
Stephen A. CALDER et al., Appellants,
v.
HILLSBORO LAND COMPANY, a Florida Corporation, et al., Appellees.
No. 1515.
District Court of Appeal of Florida. Second District.
August 5, 1960.
Rehearing Denied August 26, 1960.
*446 C.L. Chancey and Paris G. Singer, Fort Lauderdale, for appellants.
English, McCaughan & O'Bryan, Fort Lauderdale, for appellees.
SMITH, D.C., Associate Judge.
This is an appeal from a final decree entered in a suit to quiet title. The Chancellor ruled for the plaintiff below and the defendants bring this appeal.
The land involved is located near Pompano Beach, in Broward County, Florida, and is described as Government Lot 3 and Government Lot 4, in Fractional Southwest Quarter of Section 20, Township 48 South, Range 43 East, and lies just west of the present right-of-way of the Intercoastal Waterway, the Hillsboro River at this point. All of Township 48 South, Range 43 East was surveyed by the United States Government in the year 1870, with all interior lines having been run by M.A. Williams, deputy surveyor. The official field notes of the survey, as certified by M.A. Williams, and the official plat of the survey prepared from the field notes, were filed in the General Land Office. Certified copies of both the field notes and the official government plat were received in evidence. The government township plat showed three lots existing in said Fractional Southwest Quarter of Section 20  Lots 3, 4 and 5. This case involves only Government Lots 3 and 4. *447
*448 The plaintiff, Hillsboro Land Company, was admittedly the owner of the lands comprising Government Lot 3, wherever such lands may be. The defendants and counter-claimants, Stephen A. Calder and A.H. Burket, were admittedly the owners of the lands comprising Government Lot 4, wherever such lands may be, except a portion of Lot 4 not involved in these proceedings. The official government plat shows that Government Lot 3 contains 22.55 acres and that Government Lot 4 contains 30 acres.
The plaintiff acquired Government Lot 3 in 1952. At such time the land was unimproved and in its natural state. Shortly thereafter, the plaintiff subdivided the land into the subdivisions of Lighthouse Point, 1st Section, and Lighthouse Point, 2nd Section, and plats thereof were duly filed for record. The plaintiff sold and conveyed numerous lots in said subdivisions. In 1954, the defendant and counter-claimant, A.H. Burket, conveyed to the defendant and counter-claimant, Stephen A. Calder, by a metes and bounds description, a certain parcel of land purportedly being a portion of Government Lot 4, but which, when laid out upon the land, encompassed the easterly portion of the lands in the two subdivisions of Lighthouse Point, including lands claimed by the plaintiff, as well as various lots in said subdivisions claimed by grantees, direct or remote, of the plaintiff. The disputed land consists of approximately 78 lots or parcels of land in the easterly portion of the two subdivisions of Lighthouse Point, as well as portions of certain roads, drives, streets and other public ways, dedicated to the public by said plats. The plaintiff claims that all said lands are located in Government Lot 3  the defendants claim that all of such lands are located in Government Lot 4.
The plaintiff filed its suit against the defendants Calder and Burket to quiet its title against the claims of the defendants. The defendants by counterclaim sought the same relief against the plaintiff and approximately 70 other persons and corporations who were claiming title to or interest in various lots in the two subdivisions as successors in interest of the plaintiff. The counterdefendants filed answers and other pleadings. At pre-trial conference, it was stipulated that since the counterdefendants, other than the plaintiff, all claimed under the plaintiff, a decree in favor of the plaintiff on the issues between the plaintiff and the defendants would also be conclusive in favor of the other counterdefendants and upon such stipulation, it was ordered that the cause proceed to final hearing, first upon the issues between the plaintiff and the defendant, but reserving to the other counterdefendants the right to be heard upon their special defenses in the event the defendants should prevail.
The dispute centers upon the boundaries between the two government lots (Lot 3 and Lot 4). According to the official government plat, Lot 3 was bounded on the east by a body of water which was a part of the Hillsboro River and an arm extending northwesterly and northerly off from the River, and this same body of water was also the westerly and southerly boundary of Lot 4. The plat clearly shows this body of water and also shows that it is the only body of water of such size, shape and contour in said Southwest Fractional Section 20 in existence at the time of the government survey. In 1952, when the plaintiff acquired the land in Government Lot 3 and while the land in Lots 3 and 4 was still unimproved and in its natural state, except for a small portion of Lot 4 not involved in this suit, there existed in the Southwest Quarter of Section 20 one and only one body of water, known as Lake Placid. This body of water was located upon the ground approximately 800 feet easterly and northerly of the body of water shown on the official government plat which constituted the east boundary of Lot 3 and the westerly and southerly boundaries of Lot 4.
It is the plaintiff's contention that since, according to the official government survey and plat, the easterly boundary of Lot 3 was a body of water, and since Lake Placid is the *449 only body of water existing in said Fractional Section 20, and since Lake Placid conforms substantially in size, shape and contour to the body of water shown upon the government plat, Lake Placid constitutes the easterly boundary of Lot 3 and the westerly and southerly boundary of Lot 4. Accordingly, the plaintiff claims that all of the land in said Fractional Southwest Quarter of Section 20 lying between the west line of said Fractional Section 20 and the westerly shore line of Lake Placid, is a part of Lot 3, and that such lands comprise the subdivisions of Lighthouse Point, 1st Section, and Lighthouse Point, 2nd Section.
The defendants, while admitting that Lake Placid was the only body of water existing in said Fractional Southwest Quarter of Section 20 in 1952, contend that since Lake Placid is not located upon the ground in the exact location shown for the body of water shown on the official government plat, that Lake Placid is not the boundary between Government Lot 3 and Government Lot 4. The defendants contend that the boundaries of the two lots must be fixed by reference to the traverse or meander lines of the field notes of the official government survey, even though when such lines are plotted upon the ground, they fall entirely upon dry land, and thus produce a situation where the boundary between Government Lot 3 and Government Lot 4 would be a parcel of land between 300 to 400 feet in width, of undeterminate ownership, rather than a water boundary as shown by the government plat. Accordingly, the defendants contend that the westerly boundary of Lot 4 extends completely over Lake Placid and into a portion of the subdivisions of Lighthouse Point, and thus the defendants claim title to said parcels of land in said subdivisions specifically described in their counterclaim. If the plaintiff's contention is correct, Government Lot 3 now contains approximately 54.85 acres.
A copy of the official government plat of said Fractional Section 20 and a copy of a map of Government Lots 3 and 4 in said Fractional Section are here inserted for clarity. The map shows the physical condition of the lands before development and the location of Lake Placid. Superimposed upon the map are the strict plotting of the traverse lines from the government surveyor's field notes, showing the arm of the river he meandered according to his notes.
The Chancellor made certain findings of fact, summary of the evidence and conclusions of law, as follows:
"(1) That both the plaintiff and the defendants have properly deraigned title to their respective properties in question, and that this question is not in issue. (2) That the plaintiff's lands in controversy are located in Government Lot 3, Section 20, Township 48 South, Range 43 East. (3) That the defendants' lands are located in Government Lot 4, Section 20, Township 48 South, Range 43 East. (4) That the aforesaid lands were part of a patent from the United States Government to the State of Florida, based upon a survey of Township 48 South, Range 43 East, prepared by M.A. Williams, surveyor, in the year of 1870 (Plaintiff's Exhibit No. 1). (5) That Government Lot 3, according to the Williams' survey, is separated from Government Lot 4 by a body of water, Government Lot 3 lying generally west of the said body of water, and Government Lot 4 lying generally east of the said body of water and west of the Hillsboro River. (6) That an examination of the field notes prepared by M.A. Williams during the actual survey shows that he meandered a body of water lying generally west and north of the right bank of the Hillsboro River, the same body of water being the boundary between Government Lots 3 and 4. (7) That it is undisputed by either the engineers for the plaintiff or the defendants that a strict survey of the calls, courses and distances taken from the field notes of M.A. Williams of the meander of this body of water will today fall upon high, dry land, and that *450 the nearest body of water presently located in the vicinity lies approximately eight hundred feet east of the east meander line as now located upon the ground if it were plotted thereon. (8) That the engineers for both the plaintiff and the defendants testified that an attempt to retrace the path that the original surveyor, M.A. Williams, made in 1870, following his calls, courses and distances, would put the body of water that he meandered on high, dry land. (9) That at the time, and prior to the time the property was improved, as shown by Plaintiff's Exhibit No. 11, there appears to be only one body of water in the immediate vicinity or near vicinity of the properties now in question, and that body of water is today known as Lake Placid.
"All of the foregoing are undisputed facts.
"A summary of the testimony of witnesses produced on behalf of the parties concerning the physical or topographical characteristics of the area in question reveals the following:
"W.E. Smith, witness on behalf of the plaintiff, has [been] living in Pompano Beach, Florida, since 1906, and has been familiar with a body of water known as Lake Placid since that time, the body of water having been visited by this witness many times in his childhood, and at that time was known as Mutton Lake; that the body of water is presently in the same location, and has the same general contour and shape as when he first saw it in 1906.
"Edgar J. Smoke, also a resident of Pompano Beach, gave the same general testimony concerning the location of the body of water known as Lake Placid.
"E.T. Knight, witness on behalf of the plaintiff, testified that he and another party ran a sloop into the entrance of Hillsboro Inlet, which is located a short distance south of the body of water known as Lake Placid, prior to the Spanish American War  approximately six months prior thereto  and that he had taken a row boat and had gone into the arm of the Hillsboro River, or the lagoon running northwest off the Hillsboro River, and that the body of water he visited is the same body of water known as Lake Placid.
"The plaintiff had prepared, under the supervision of his engineer, Eugene W. Stoner, test borings to take soil samples from the area that would have been enclosed by a strict plotting of the calls, courses and distances of the survey of M.A. Williams of 1870 (Plaintiff's Exhibit No. 15), and that the test borings taken therefrom were submitted to Professor Virgil Sleight, Professor of Geology at the University of Miami, who testified that from his analysis of the soil formations taken from the test borings, it would indicate that the land in question, except for a small portion on the extreme east, had not been covered or under water in the last several hundred years, and possibly the last thousand years.
"Dr. Taylor Alexander, Professor of Botany at the University of Miami, with the aid and guidance of the plaintiff's engineer, Stoner, located three pine trees, locally known as `Dade County Pines' or `Caribbean Pines' which the professor identified as being virgin pines in the approximate center of the area that would have been enclosed on the ground by the 1870 survey (Plaintiff's Exhibit No. 16, 17 and 18).
"Test borings were removed from the trees, labeled, and indicated that the ages of the trees were as follows: Tree No. 1, at least 108 years old; Tree No. 2, at least 93 years old; and Tree No. 3, at least 81 years old.

*451 "A summary of the testimony of the witnesses for the defendants is disclosed as follows:
"Tom M. Bryant, a resident of Fort Lauderdale, Florida, testified that he traveled from Lake Worth, in Palm Beach County, down the `Inland Waterway' to Fort Lauderdale, in 1895. This witness further testified that he has lived in Broward County, Florida continuously since 1903, and has been familiar with the area of land under discussion since 1903.
"This witness had occasion to visit the vicinity of the Hillsboro Inlet rather frequently in 1905 and 1906 while his brother was constructing the lighthouse, located at the Hillsboro Inlet.
"Mr. Bryant testified that the only body of water known by him to be in the area under discussion was a body of water that could be observed west of `Captain Knight's place.' Captain Knight's place has been identified as being located on a tip of land that is on the extreme southeast tip of the shoreline on the east boundary of the body of water now known as Lake Placid. This body of water, or lagoon, could be observed while traveling up the Hillsboro River from the south, and could not be observed by a traveler moving from the north toward the south. This body of water was identified by the witness as the present body of water known as Lake Placid.
"Mr. MacLaughlin, a registered land surveyor, and Mr. James Silvola, also a surveyor, testified as expert witnesses for the defense. The summary of these two witnesses' testimony is not in conflict with the testimony of the plaintiff's surveyor as to a plotting of the calls, courses and distances of the original surveyor.
"All the engineers testified that a strict plotting of these calls, courses and distances could locate the body of water that was meandered by Mr. Williams on high, dry land.
"Mr. MacLaughlin was of the opinion that the surveyor actually meandered a body of water as indicated from his field notes, and that the body of water no longer exists, having dried up over the years as the result of the falling water table along the lower east coast. Mr. MacLaughlin further was of the opinion that Lake Placid was no more than a mud flat and was not meandered by M.A. Williams, and that this body of water may have been created subsequent to the original survey. However, this witness could not offer any physical evidence to support his conclusions.
"The plaintiff offered certain documentary evidence as follows:
"A topographical survey made in 1884, and on file with the United States Coast and Geodetic Survey, the same being Chart No. T-16-57 (Plaintiff's Exhibit No. 7). This survey discloses a body of water in the area in question substantially the same in size and shape as the present body of water known as Lake Placid.
"A hydrographic chart, being Chart No. H-1605A, made in 1884 (Plaintiff's Exhibit No. 9). This chart indicates the depths of waters in the area of the land in question, more specifically the depth of the water located on said map and the Hillsboro River (the arm of the Hillsboro River being approximately the same size and shape of the body of water now known as Lake Placid).
"The plaintiff proposes one proposition, and that is that the body of water now known as Lake Placid is the same body of water that was meandered by M.A. Williams at the time of the original survey in 1870.

*452 "The defendants propose two questions:
"1. That the original surveyor, M.A. Williams, meandered a body of water, and that the body of water he meandered no longer exists.
"2. That there were two bodies of water in the area, and that the body of water that was meandered no longer exists, and that the body of water presently known as Lake Placid was the other body of water in the area at the time of the survey, and was not a sufficient depth to have been considered by the original surveyor.
"The defendants have not offered any positive testimony to support either of their propositions.
"In support of the proposition that more than one body of water existed in the area, the defendants offered many old maps dating from 1828 to approximately 1868. The Court has given these ancient maps full consideration, trying to reconcile the questions to be decided, and has concluded that the only materiality that these maps may have to the question under consideration is their historical value, and nothing more.
"None of the ancient documents offered by the defendants were prepared for any specific purpose to locate, chart or sound any bodies of water in the area under discussion.
"The defendants' sole testimony and documentary proof that the body of water that may have existed at the time of the original survey has since dried up was based upon general information of Mr. Bryant concerning the water table when he first came to Broward County, and the subsequent lowering over the years due to drainage and other natural conditions, together with certain weather data covering a period of time prior to and subsequent to the survey. Mr. MacLaughlin generally corroborated Mr. Bryant's testimony concerning the lowering of the water table along the lower east coast. This was a matter of common knowledge.
"The questions of law considered by the Court are as follows:
"It is a rule of law that what is the boundary line between two parcels of property is a question of law, and where the boundary line is located is a question of fact. Andreau [Andreu] v. Watkins [26 Fla. 390], 7 So. 870 [876], Thompson on real property, Permanent Edition 466.
"It is undisputed that, according to the original government survey, Government Lots 3 and 4, in Section 20, Township 48 South, Range 43 East, were divided by a body of water that was meandered by M.A. Williams, the original surveyor.
"The question to be determined by the Court is whether or not the body of water so meandered by Williams can be ascertained at this time.
"The conclusive evidence offered by both the plaintiff and the defendants is that there is only one body of water located in the vicinity or immediate vicinity of the property in dispute, and that body of water is now known as Lake Placid. However, this body of water is removed from the exact location that would be disclosed by a strict plotting of the calls, courses and distances of the body of water which was meandered according to the field notes of M.A. Williams.
"The law in Florida is clear that the official government survey actually creates the boundary between properties rather than merely identifies the same. Bishop v. Johnson [Fla.App.], 100 So.2d 817.
"The legal meaning of the word `survey' means the actual survey upon *453 the ground made by the original government surveyor; that is, the footsteps of the surveyor.
"The engineers' testimony for both the plaintiff and the defendants indicates that it is impossible to reconcile the physical topography of the area in question by attempting to retrace the original surveyor's footsteps, based upon his field notes, with the physical conditions existing thereon.
"It has been said that in determining boundary lines the law recognizes and names in their order of importance natural monuments, artificial monuments, distances, courses and quantities, but the controlling consideration is the intention of the parties. Dufrene v. Bernstein [190 Fla. 66], 181 So. 859.
"In order to eliminate consideration of the present body of water in the area known as Lake Placid, it would have to be shown that the original survey was in such gross error that it would constitute fraud either on the Federal Government or on parties claiming under it. This has not been shown.
"As the Court understands the law, if there are errors in the calls, courses and distances, these must give way to the natural monuments that the original surveyor may have found upon the ground by retracing his footsteps as he made the survey. It is undisputed that the field notes, as prepared by M.A. Williams, showed that he traversed a body of water, and that this body of water was established as the boundary between Government Lots 3 and 4.
"If it were impossible to determine that a body of water existed in the area, or immediate vicinity of the land in question, at the time of the original survey, then the Court could conclude that the survey was in error to such a degree that it would constitute fraud.
"A strict plotting of the calls, courses and distances, and to use the same to reconstruct an overlay by merely moving the same over the present body of water known as Lake Placid, would indicate that the traverse made by Williams would approximate that of the body of water known as Lake Placid being substantially similar in shape, size and contour.
"The Court must also consider that if the body of water that was meandered by M.A. Williams had dried up or disappeared over the years as argued by the defendants, additional factors would have to be considered. One of these factors is to the effect that the title to the bottom lands of this body of water would have passed to the State of Florida as sovereign lands under the patent from the United States Government, since the abutting property was conveyed as government lots, being specifically surveyed lands merely giving riparian or littoral rights to the abutting property owners, and not conveying any ownership to the bottom lands of the adjacent water. This theory of the defendants would result in a hiatus of land being located between Government Lots 3 and 4, and the evidence offered by the plaintiff completely refutes this proposition.
"A lengthy questioning by the Court of Mr. MacLaughlin, the defendants' witness, did not disclose that there was any evidence, such as a shoreline, a depressed area, or any other physical evidence that would have indicated that a body of water ever existed in the area meandered by Williams from a strict plotting of the calls, courses and distances on the ground today.
* * * * * *
"The Court, * * *, has concluded that the body of water known as Lake Placid is the actual body of water that was traversed by M.A. Williams in 1870, and that this body of water is *454 the actual boundary line between Government Lots 3 and 4, as it existed prior to the time that the area was developed as shown by Plaintiff's Exhibit No. 11."
The trial court entered a final decree quieting the plaintiff's title and dismissed the defendants' counterclaim.
The Chancellor's findings of fact are supported by clear and convincing evidence.
The parties alleged in their respective pleadings:
Paragraph 6, Count I of the Amended Complaint states:
"According to the said Government survey, Government Lot 3 of said Section 20-48-43, included all that portion of the lands in the fractional Southwest Quarter of said Section 20, which were bounded as follows: on the West by the West line of said Section 20; on the North by the center line of said Section; on the South by the South line of said Section; and on the East by a body of water separating said Government Lot 3 from Government Lot 4 in the same section, which body of water was described by the Government surveyor as being a part of the Hillsboro River. The plaintiff alleges that the said body of water which constituted the East boundary of Government Lot 3 and the West boundary of said Government Lot 4, and which separated said Government lots from each other, according to said survey, is now known as Lake Placid, and all of the lands owned by Plaintiff * * lie West of Lake Placid, and West of that portion of the said Hillsboro River now included within the right-of-way of the Intra-coastal Waterway."
Paragraph 6 of Defendant's Answer states:
"Answering Paragraph 6 of Count I of said Amended Complaint, Defendants admit the allegations thereof contained in the first complete sentence thereof generally describing the boundaries of Government Lot 3 of Section 20, Township 48 South, Range 43 East but aver that the body of water therein mentioned was described by the government surveyor as being an arm of the Hillsboro River. Defendants deny the remainder of the allegations of said Paragraph 6."
Paragraph I of Defendants' Third Amended Counterclaim states:
"The original United States Government survey made by M.A. Williams, surveyor, in 1870 shows the S.W. quarter of Section 20, Township 48 South, Range 43 East to be divided into three Government Lots numbered 3, 4 and 5 respectively. * * * Said survey shows said Government Lot 4 to consist of 30 acres. The north boundary line of said Lot 4 is shown as the east and west quarter section line of said section. The easterly and southerly boundary of said Lot 4 as shown on said survey is the west shore line of said Hillsboro River and the western boundary of said Lot 4 as shown on said survey is the eastern shore line of an arm of Hillsboro River. Said government survey shows that the northern boundary of said Government Lot 3 is the east and west quarter section line of said section 20, that the eastern boundary of said Government Lot 3 is the western shore line of said arm of Hillsboro River; that the southern boundary of said Government Lot 3 is the south boundary line of said section, and that the western boundary of said Lot 3 is the west boundary line of said section. Said government survey shows that said Government Lot 3 consists of 22.53 acres. Excerpts from a copy of Field Notes of said United States Government Survey of 1870, as certified by Nathan Mayo, Commissioner of Agriculture *455 of the State of Florida, are as follows: * * *."
Paragraph I of Plaintiff's answer to counterclaim states:
"In answer to paragraph I, the Plaintiff admits that the original United States Government Survey made by M.A. Williams in 1870 divided the Southwest quarter of Section 20, Township 48 South, Range 43 East, into the Lots as alleged in said paragraph, and further admits that the said survey established the boundaries of said Lots by the monuments as described therein. The Plaintiff denied, however, that the said original government survey established the acreage for each of said Lots as alleged in said paragraph. The Plaintiff admits that the map or plat prepared from the notes of the survey purports to show the number of acres for each of said lots, as are alleged, but Plaintiff denies that such designations of acreage upon the map or plat was any part of the actual survey, and Plaintiff further denies that the Lots as actually surveyed contained the quantities of land as shown upon the said map or plat. The Plaintiff admits the correctness of the extract from the field notes of the survey as are set forth in said paragraph, but denies that such field notes correctly described the course of the Hillsboro River as actually surveyed, and further denies that such notes control the survey as made upon the land."
Thus it is seen that the pleadings created specific issues (1) on whether or not the body of water known as Lake Placid is the body of water dividing Lots 3 and 4 upon the government plat, (2) on whether or not the field notes correctly described the course of the Hillsboro River as actually surveyed, (3) on whether or not the field notes control the survey as made upon the land, and (4) on whether or not the Lots as actually surveyed contained the quantities of land as shown upon the government plat.
It is undisputed that Government Lot 3, according to the original government survey, is separated from Government Lot 4 by a body of water, Government Lot 3 lying generally west of said body of water and Government Lot 4 lying generally east of the said body of water and west of the Hillsboro River. An examination of the field notes prepared by M.A. Williams, the deputy government surveyor, during the actual survey, shows that he meandered a body of water lying generally west and north of the right bank of the Hillsboro River, the same body of water being the boundary between Government Lots 3 and 4. The main issue created by the pleadings required the finding, if it could be found, of the body of water surveyed by the government surveyor and established as the boundary between said Lots. The map of a part of Section 20, Twp. 48 S., R. 48 E., dated June 5, 1951, revised December 29, 1952 (Plaintiff's Exhibit No. 4), the Topographical Survey made in 1884 and on file with the United States Coast and Geodetic Survey, Chart No. T-16-57 (Plaintiff's Exhibits 7 and 8), the Hydrographic Survey, Chart No. H-1605-A, made in 1884 and on file with the United States Coast and Geodetic Survey (Plaintiff's Exhibit 9), the Nautical Chart No. 164, edition of 1887, re-issued in 1917, certified by the United States Coast and Geodetic Survey (Plaintiff's Exhibit 10), and Aerial Photograph of the subject area made in 1947 and on file with the United States Department of Agriculture (Plaintiff's Exhibit 11), an Aerial Photograph of the subject area made in 1954 (Plaintiff's Exhibit 12), Cross-Section Map, showing borings from which soil test samples were taken (Plaintiff's Exhibit 15), borings taken from three trees (Plaintiff's Exhibits 16, 17 and 18), and written Soil Analysis Report (Plaintiff's Exhibit 19), each and all of which were objected to by the defendants, were material, competent and admissible in evidence on the issues involved. The purpose of *456 such evidence was not to contradict or impeach the official government survey and plat, but rather to show the area in question and its physical characteristics, so that from all of the evidence, if possible, it could be determined what the government surveyor actually did when he made the original survey and what body of water he actually made the boundary between said Lots 3 and 4.
In 8 Am.Jur., Boundaries, § 89, page 810, the following is stated:
"The general rules of evidence apply to the proof of boundaries. Any competent evidence, whether documentary or parol, which is admissible to establish other facts and which will tend to identify the location of a disputed boundary is admissible and may be received in evidence; * * *."
The text continues at § 94, page 812:
"As a general rule, a description of premises is deemed certain if it may be made certain, and extrinsic evidence is admissible for this purpose. It is only when the description of land is so inaccurate that its identity is wholly uncertain at the time of the execution of the conveyance that a grant or deed is void. Any other defect therein is considered latent, and may be explained by parol evidence, whether arising from facts independent of an attempted actual survey, or perceived only when the calls of the description are laid down upon the ground and found imperfect or conflicting. Thus, the true location of boundaries may be shown by parol evidence, under the well-established rule of law that such evidence is always admissible to apply a writing to its subject, and therefore to identify monuments called for in descriptions of tracts of land contained in patents and deeds. * * *."
The following appears in Andreu v. Watkins, 26 Fla. 390, 7 So. 876, 878:
"* * * Where the boundaries of land described in any deed really are, is always a question of fact; and parol testimony is admissible to show where they are, or apply the description to its subject-matter * * *." See also Reid et al. v. Barry, 93 Fla. 849, 112 So. 846, and Mitchell v. Moore, 152 Fla. 843, 13 So.2d 314.
In the case of Brown v. Huger, 21 How. 305, 62 U.S. 305, 16 L.Ed. 125, it is stated:
"* * * The patent itself could not be altered by evidence aliunde; but proof, as to the existence and character of the objects or subjects to which it was applicable, was regular and even necessary to give it effect * * *."
The evidence objected to was admitted only for the purpose of establishing the government survey as it was actually run and not to contradict or impeach it.
The record shows no positive evidence to support the defendants' contention that a body of water, other than Lake Placid, existed in 1870 when the original government survey was made, that such other body of water was located within a strict plotting of the field notes on the area, and that such body of water has since dried up.
It is not disputed that the original government survey and government plat made the body of water in said Fractional Section 20 the boundary between Lots 3 and 4. The evidence is clear and convincing that the body of water known as Lake Placid was and is the only body of water of any substantial size located in said Fractional Section, other than the Hillsboro River, and that to a large degree the size, shape and contour of Lake Placid corresponds with the body of water meandered by the government surveyor.
It is the survey as it was actually made, whatever it is, that controls.
*457 The Court, in Miller v. White, 23 Fla. 301, 2 So. 614, 617, said:
"* * * The survey actually made by the United States government, and according to which the lands were sold, whatever it is, controls as between these parties * * *.
In Brown v. Dunn, 135 Wis. 374, 115 N.W. 1097, 1098, the Court said:
"It is established as a general rule of law both in our own court and in the courts of the United States that, where by the original survey and government plat a tract of land appears to have as its boundary a body of water, such body of water is a natural monument, and will constitute the boundary, however distant or variant from the position indicated for it by the meander line, and hence will control as a call of the survey over either distances or quantity of land designated in the conveyance or on the government plat. Railroad Co. v. Schurmeier, 7 Wall. 272, 7 U.S. 272, 19 L.Ed. 74; Mitchell v. Smale, 140 U.S. 406, 414, 11 Sup.Ct. 819, 35 L.Ed. 442; Shufeldt v. Spaulding, 37 Wis. 662; Lyon v. Fairbanks, 79 Wis. 455, 48 N.W. 492, 24 Am.St. Rep. 732."
The Court stated in Galt v. Willingham, 5 Cir., 11 F.2d 757, 758:
"* * * But in re-establishing the lines of a survey the footsteps of the original surveyor should be followed, and it is immaterial that the lines actually run by him are not correct. R.S. § 2396 (Comp.St. Sec. 4804 [43 U.S.C.A. § 752]); Ayers v. Watson, 137 U.S. 584, 11 S.Ct. 201, 34 L.Ed. 803. Courses and distances yield to natural monuments and boundaries. This rule is so strict that even the government itself cannot question it * * *." (Italics supplied.)
The Court stated in Kirch v. Persinger, 87 Fla. 364, 100 So. 166, 168:
"It is well settled that, where a line was actually run and a division made in an original survey of land by the government, and the line of division was marked by corners or natural objects, and such survey was established in accordance with the government field notes, the grantee in a patent from the government will take according to such survey, notwithstanding any mistaken description as to courses and distances or the quantity of land to be surveyed."
It is stated in Kelsey v. Lake Childs Co., 93 Fla. 743, 112 So. 887, 888:
"Original actual surveys of public lands by the United States government, on the faith of which property rights have been acquired, control over surveys subsequently made by the government which affect such rights. 22 R.C.L. 282, and cases cited; Pittsmont Copper Co. v. Vanina, 71 Mont. 44, 227 P. 46; Groover v. Coffee, 19 Fla. 61; Coffee v. Groover, 20 Fla. 64; Liddon v. Hodnett, 22 Fla. 442.
"The survey actually made by the United States government and according to which it sold the land, controls as between parties to an action of ejectment covering such land. Miller v. White, 23 Fla. 301, 2 So. 614." See also Wildeboer v. Hack, Fla.App. 1957, 97 So.2d 29.
In determining boundary lines, the law recognizes, named in the order of their importance, natural monuments, artificial monuments, distances, courses and quantity.
The Court stated in Brown v. Huger, 21 How. 305, 62 U.S. 305, 16 L.Ed. 125:
"In ascertaining the boundaries of surveys or patents, the universal rule is this: that wherever natural or permanent objects are embraced in the calls of either, these have absolute *458 control, and both course and distance must yield to their influence."
In Watrous v. Morrison, 33 Fla. 261, 14 So. 805, 807, it is stated:
"In the sale of lands in sections, or subdivisions thereof, including lots, according to the government survey, the survey as actually made controls. Miller v. White, 23 Fla. 301, 2 South. 614; Liddon v. Hodnett, 22 Fla. 442. It is the survey as it was actually run on the ground that governs, if the monuments, corners, or lines actually established can be located or proved. Courses and distances yield to such corners and lines so long as the latter can be located, and for the reason that the latter are the fact or truth of the survey as it was actually made, while the former are but descriptions of the act done, and, when inaccurate, they cannot change the fact * * *."
In the ancient Florida case of Daggett v. Willey, 1855, 6 Fla. 482, the court said:
"It is a general principle that the course and distance must yield to natural objects called for in the patent. All lands are supposed to be actually surveyed, and the intention of the grant is to convey the land according to that actual survey; consequently, if marked trees and marked corners be found conformable to the calls of the patent, or mountains, or any other natural objects, distances must be lengthened or shortened and courses carried so as to conform to those objects. The reason of the rule is, that it is the intention of the grants to convey the land actually surveyed, and mistakes in course or distance, are more probable and frequent than in marked trees, mountains, rivers, or the natural objects capable of being clearly distinguished and accurately described." (Italics supplied.)
The Louisiana court in the case of Dufrene v. Bernstein, 1938, 190 La. 66, 181 So. 859, 860, has succinctly stated the order of importance of survey calls as follows:
"* * * In determining boundary lines, the law recognizes certain well known guides which are in the order of their importance (1) natural monuments; (2) artificial monuments; (3) distances; (4) courses; and (5) quantity * * *."
In M'Iver's Lessee v. Walker and Another, 9 Cranch 173, 13 U.S. 173, 3 L.Ed. 694, the United States Supreme Court stated:
"It is undoubtedly the practice of surveyors, and the practice was proved in this cause, to express in their plats and certificates of survey, the courses which are designated by the needle; and if nothing exists to control the call for course and distance, the land must be bounded by the courses and distances of the patent. * * * But it is a general principle that the course and distance must yield to natural objects called for in the patent. All lands are supposed to be actually surveyed, and the intention of the grant is to convey the land according to that actual survey; consequently, if marked trees and marked corners be found conformably to the calls of the patent, or if water-courses be called for in the patent, or mountains or any other natural objects, distances must be lengthened or shortened, and courses varied so as to conform to those objects."
The Court stated in Rue v. Oregon & Washington R. Co., 109 Wash. 436, 186 P. 1074, 1077:
"By the United States government system of surveys, a meander line is run when a water course or other body of water is the external boundary of the adjacent land. The line showing the place of the water course or other body of water and its course, sinuousities, and distance, is called a `meander line.' The general rule adopted by *459 both federal and state courts is that meander lines are not run as boundaries of the fractional tracts thus surveyed, but for the purpose of defining the sinuousities of the banks of the streams and other bodies of water and as a means of ascertaining the acreage of such body of land subject to sale and which is to be paid for by the purchaser. It has therefore generally been held both by federal and state courts that such meander lines are for the purpose of showing the border lines of the streams, but that the water courses themselves constitute the real boundaries * * *."
The recent Florida case of Bishop v. Johnson, Fla.App. 1958, 100 So.2d 817, 819, decided by the District Court of Appeal, First District, involved a peninsula jutting out into a lake. The official government plat identified this peninsula as being Lot 9 of Section 21, and Lot 3 of Section 22. By mesne conveyances originating with the U.S., title to these two lots was acquired by one of the parties to this action. Subsequently, by virtue of a private survey, it was discovered that the only existing peninsula was actually located south and west of the position shown on the official plat for the peninsula, and that the existing peninsula is appended to the mainland at the north corner of Section 27  an entirely different section. Under the belief that a second peninsula existed, the Trustees of the Internal Improvement Fund issued to another party a deed to the peninsula, describing it by metes and bounds. The dispute then existed between the party claiming title by reference to the original government plat, against the party claiming title according to the conveyance from the Trustees. The court held in favor of the party claiming title according to the government plat  even though the land was located upon the ground entirely at a different location than that shown by the official plat, and even in a different section. The court said:
"It is to be noted at the outset that the government survey of 1849 did not merely ascertain or identify the disputed lands, but created Lots 9 and 3, in Sections 21 and 22 respectively, being that peninsula lying in Township 10 S., Range 23 East. As heretofore stated, the parties admit that there is but one such body of land appended to the east shore of Water Pen Lake. This peninsula, as created, designated and described by government survey, was conveyed through various mesne conveyances to appellees. The mere fact that a subsequent private survey shows an error by the United States Deputy Surveyor in locating the peninsula on the official plat is immaterial, since the latter survey is not admissible in evidence to affect or change the lines or location of land sold in accordance with an official government survey and plat."
The evidence conclusively shows that M.A. Williams, the deputy government surveyor, made the body of water, the arm of the river now known as Lake Placid, the boundary between Government Lots 3 and 4. If some error was made in recording his meander of this body of water in his field notes, this error does not affect or change the boundary, the natural monument which he made the boundary between said lots.
The Chancellor's finding does not contradict or impeach the original survey, but sustains it in that it finds that the body of water known as Lake Placid is the actual body of water that was traversed by the government surveyor and determines this body of water, which the government survey and plat made the boundary line between Government Lots 3 and 4, to be the boundary line between said lots.
The defendants assert that according to the original government survey and plat, Lot 3 contains 22.55 acres and Lot 4 contains 30 acres and if the Chancellor's *460 decree stands, Government Lot 3 contains 54.85 acres and this will permit the plaintiff to retain substantially more than its predecessor in title received under the original patent from the government. In Schlosser v. Crookshank, 96 Iowa, 414, 65 N.W. 344, 346, a similar contention was made, it appearing that one of the parties was getting approximately 100 acres, another approximately 26.12 acres, and another approximately 34 acres, more than shown on the government plat. The court said:
"Appellants claim that as the patent from the government stated the number of acres of land purporting to be conveyed, and as it corresponds with the acreage within the meander line and the subdivisional lines of the surveyed tract, plaintiffs have all the land which their remote grantors got from the government, and the land in dispute does not belong to them. The statement of the number of acres in these patents in no way limits the extent of the grant. To so hold would, in effect, be holding that a meandered line was a boundary line, which, as we have seen, is not the case. The riparian holder of the patent takes all the land to the shore of the lake, though he may thereby obtain a larger acreage than his patent calls for." See also Rue v. Oregon & Washington R. Co., supra.
The Chancellor's findings and conclusions are supported by clear and convincing evidence and by law. The final decree quieting title to the lands therein described in the plaintiff is affirmed.
ALLEN, C.J., and SHANNON, J., concur.