145 So.2d 737 (1962)
TRUSTEES OF the INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, Appellants,
v.
Harry TOFFEL, Trustee, Appellee.
No. 2259.
District Court of Appeal of Florida. Second District.
August 31, 1962.
Rehearing Denied October 26, 1962.
*738 Richard W. Ervin, Atty. Gen., Edward S. Jaffry, Asst. Atty. Gen., Tallahassee, for appellants.
Pallot, Silver, Pallot, Stern & Mintz, Miami, for appellee.
KANNER, Judge.
The suit from which this appeal emerges was filed by appellee-plaintiff for the purpose of quieting his title to 386 acres of land as against claims interposed by the Trustees of the Internal Improvement Fund of Florida, appellants, and other defendants who have not appealed. The trustees seek review of the chancellor's final decree adverse to them.
In 1956, appellee had purchased over 1650 acres of certain wild and uninhabited lands in DeSoto County, Florida, for the sum of $292,000. These lands had descended through mesne conveyances to appellee from the State of Florida, which had acquired them under the Swamp and Overflowed Land Act of Congress of 1850 through Patent No. 9 dated November 6, 1856, issued to the State of Florida pursuant to the original survey known as the Irwin survey. The parcels of land bordered the west bank of the Peace River which had been meandered by Irwin in accordance with the "General Instructions to Surveyors" dated November 3, 1842.
In 1939, sections 27 and 34 were caused to be resurveyed by the United States Government, and a survey plat entitled "Dependent *739 Resurvey and Extension Survey" was approved on April 17, 1942. The resurvey purported to correct certain deficiencies in the meander line of the Peace River upon which the property in controversy fronts and to establish title in the United States to a 386 acre tract, rectangular in shape, which comprises the entire riverfront area of appellee's land. This tract is bordered on the west by the meander line of the Irwin survey and on the east by the Peace River and runs from the north line of section 27 along the riverfront to the south line of section 34. By Patent No. 9 under the original survey whole fractional sections 27 and 34 were deeded to the State of Florida. Section 27 was divided into government lots 1 through 4; while section 34 was subdivided into government lots 1 and 2. It was these lots that were purchased by appellee. Subsequent to and under the resurvey, the United States Government issued Patent No. 1118121, dated March 17, 1944 to the State of Florida, conveying to it along with other lands the 386 acres of riverfront, except lots 8, 9, and 18 in section 27. The resurvey plat was first recorded in the DeSoto County public records on December 30, 1956, prior to the filing of this suit and two months after appellee had consummated his purchase. The property in controversy patented to the trustees is described as follows:
"That certain tract of land bounded on the North by the North line of the said Section 27 extended in an Easterly direction to the high water mark of Peace River; bounded on the South by the South line of said Section 34 extended in an Easterly direction to the high water mark of Peace River; bounded on the West by the Easterly meander line of the U.S. Government Survey of said Sections 27 and 34 approved July 23, 1850; and bounded on the East by the high water mark of Peace River; less and except that portion thereof identified as Government Lots 8, 9 and 18."
Named as defendants in the quiet title suit were the Trustees, contract purchasers, and the United States. The United States, it is asserted, was named as a party defendant for the purpose of quieting title to three lots numbered 8, 9, and 18 in section 27, not included in conveyance to the State in 1944. The United States filed a motion to dismiss for lack of jurisdiction. Appellee avers that his counsel advised that the motion was well founded, that the court would without doubt dismiss the complaint against the United States, and that the only practical method of quieting his title to lots 8, 9 and 18 was to acquire the claimed interest of the United States through compromise arrangement. He subsequently paid $5,872 for the asserted title of the United States in lots 9 and 18 at a public sale proceeding conducted by the federal government, but appellee emphasizes that at no time did he do anything more than purchase the alleged right, title, and interest of the United States in compromise and settlement of the disputed claim.
The lands involved, patented as swamp and overflowed lands, are generally wild and unimproved. During the proceedings, the chancellor, in the presence of counsel and the parties, viewed the property by boat and by truck so as to acquaint himself with the lands in question and the area as a whole.
Of considerable size, the record on appeal contains several hundred pages of testimony and numerous exhibits. The testimony includes that of lay witnesses, together with that of experts for the respective parties in such fields as surveying, engineering, and geology.
Evidence of appellee demonstrates, essentially, that the 386 acres lying east of the Irwin meander line along the shore of Peace River was "swamp, muck, slimes, some sand bars, escarpment;" that the Peace River had in the past moved and shifted with considerable accretion through action of the river taking place after the running of the original meander line and *740 with the accreted soil adding to the quantity of land between the meander line and the river; and that the original meander line reasonably conformed to the probable high water mark of the Peace River as it existed in 1849. Further testimony was to the effect that the meander line run in the original survey in 1849 was not grossly erroneous compared to other meander lines of the time, that it conformed to the general instructions for surveyors in effect then, except for lots 8, 9, and 18 in section 27, and, by retracing of the meander lines run by Irwin, that those lines reflected Irwin's field notes and thus were not grossly erroneous.
In contrast, testimony for appellants demonstrates that the survey run by Irwin on the west bank of the Peace River had been extremely general, that the rather generalized run made by that surveyor was not consistent with the water currently present in the area, that the survey on the west bank of the Peace River did not show the demarcation between the Peace River valley and the high land as closely as did the survey of the east bank. Additional testimony was that there were wide variations between the topography of the area in question and the survey maps made from the 1849 survey, that many monuments recorded could not now be found, and that the meander line run in the 1849 survey was grossly erroneous in depicting the shore or bank of the river. Accretion since 1849 was credited through testimony on behalf of appellants as having been only a minor factor in accounting for the discrepancies noted between the meander line and the bank of Peace River. Rather, the effect of their testimony is that most of the accretion had occurred prior to 1849, although one of the expert witnesses expressed the belief that none of the property involved constituted accretion.
The chancellor found that the meander line of the west bank of the Peace River in sections 27 and 34 as established by the 1849 Irwin survey was not grossly erroneous, that it did not constitute a fraudulent survey, and that the lands in sections 27 and 34 presently lying between that meander line on the west and Peace River on the east do not constitute lands omitted from the 1849 survey. He additionally found that the United States conveyed all the lands in those sections up to the high water mark of the west bank of Peace River through United States Swamp Patent No. 9, that the present boundary of plaintiff's property is the present high water mark of the west bank of Peace River. Other findings were that the channel of Peace River has constantly shifted throughout the Peace River valley, that the only area which does not constitute accretion is a described segment immediately east of Irwin's meander line, and that the appellee was owner of certain specified property but had failed to show any right by accretion or otherwise to other named property.
Appellants' theory of ownership under the resurvey goes back basically to their assertion of gross error in the meander line of the west bank of the Peace River as run by Irwin in the 1849 survey. Their evidence, they say, proves that line to have been grossly erroneous. Under this, they contend that if at the time of the Irwin survey there were lands lying between the erroneous meander line and the river bank, whether accreted lands or not, those lands were omitted and unsurveyed and title to them remained in the United States; and any accreted lands attaching to the unconveyed and omitted lands subsequent to the survey accreted to property belonging to the United States and so became property of the federal government, subject to later conveyance to the appellant trustees.
The gist of appellee's argument is that the evidence presented by him proves that the meander line of the Irwin survey was not grossly erroneous. He urges that the language of the original patent of 1856 therefore controls, since it conveyed all of sections 27 and 34 to the high water mark of the Peace River. According to appellee, *741 the federal government thereafter had no undisposed of lands in those sections to resurvey, hence the patent issued pursuant to the resurvey attempted to impair his vested rights gained under the original survey. Although contending that the evidence showed the major portion of the lands to have been the result of accretion, most of which occurred since 1849, appellee's position is that even had accretion not been proved, a determination upholding the original meander line of Irwin was conclusive.
We direct our attention first to the basic contention of appellants that the meander line of the 1849 survey was grossly erroneous, for fundamentally this is the element which must be established in order for the United States to have retained ownership. In this respect, it is necessary that we take note of several significant principles of law.
We think it appropriate first to point out that the resurvey was run under authority of Title 43, U.S.C.A., Public Lands, § 772, providing for resurveys or retracements to mark the boundaries of lands undisposed of. By that code, the Secretary of the Interior is charged that no such resurvey or retracement shall be so executed as to impair the bona fide rights or claims of any claimant, entryman, or owner of lands affected by the resurvey or retracement.
Meander lines merely define the general contour of a shore; and unless there is a clear indication to the contrary, the water itself is the actual boundary. The purpose of such lines is to define the sinuosities of the stream and to aid in ascertaining the quantity of land to be disposed of. In the absence of exceptions or reservations, patents and other conveyances of the subdivisions shown to border upon the stream or body of water carry title to the water's edge and include the unmeasured strip which usually exists between the water's edge and the meander line. Patton on Titles, Vol. 1, § 117, page 297; 73 C.J.S. Public Lands § 32 b, page 682; 26 Fla.Jur. Public Lands § 43, page 54; Brickell v. Trammell, 1919, 77 Fla. 544, 82 So. 221; Martin v. Busch, 1927, 93 Fla. 535, 112 So. 274; South Florida Farms Co. v. Goodno, 1922, 84 Fla. 532, 94 So. 672.
The general rule that a meander line is not a boundary, however, is subject to certain exceptions. Such a line may constitute a boundary where so intended or where it is established at such an excessive distance from the actual shore as to leave between it and the body of water an excess of unsurveyed land so great as to clearly and palpably indicate fraud or mistake in the survey. Where through fraud or mistake a segment of the public lands was erroneously omitted from the survey, the United States is not divested of title to it. Clark on Surveying and Boundaries, Second Edition, § 210, page 215; 11 C.J.S. Boundaries § 30 b, page 574; 42 Am.Jur. Public Lands § 43, page 822; 8 Am.Jur. Boundaries, § 29-33, pages 766-770; Martin v. Busch, supra; Lord v. Curry 1916, 71 Fla. 68, 71 So. 21.
A corrected survey or resurvey can be used instead of an original survey until such time as rights have been acquired to a specific tract of land under the original survey. However, the original actual survey of public lands of the federal government on the faith of which rights have been acquired controls as against a survey subsequently made by the government affecting those rights. The survey last accepted by the government prior to divesting itself of title is the one which takes precedence, 73 C.J.S. Public Lands § 33-35, pages 683-684; 26 Fla.Jur. Public Lands § 100, page 111; 4 Fla.Jur. Boundaries § 11-12, pages 580-581; Kelsey v. Lake Childs Co., 1927, 93 Fla. 743, 112 So. 887; Calder v. Hillsboro Land Company, Fla.App. 1960, 122 So.2d 445.
In making a resurvey, the question is, not where would an entirely accurate survey locate the lines, but where did the original survey locate the lines. In all cases, the original survey, wherever possible, *742 must be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it. The purpose of a resurvey is to furnish proof of the location of the lost lines or monuments, and not to dispute the correctness of the original survey or to control it. Wildeboer v. Hack, Fla. App. 1957, 97 So.2d 29.
Asserted error in the original survey and the effect of the running of an erroneous meander line as it related to discrepancies existing between that line and the shore of the body of water meandered have been considered upon a number of occasions by the United States Supreme Court, as well as by this and other jurisdictions.
One of the early cases emanating from the federal jurisdiction is Mitchell v. Smale, 1891, 140 U.S. 406, 11 S.Ct. 819, 35 L.Ed. 442. There, the controversy centered about a strip or tongue of land running into a lake. The official plat made from a government survey of 1834-35 under which plaintiff claimed did not show the meander line but did show the general form of the lake deduced therefrom; and the surrounding fractional lots were shown to be adjoining and bordering upon the lake. A resurvey was made and a second patent issued under it by the United States, conveying the strip of land. Reversing the lower court's decision for defendant, the court pointed out, "It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary." See also a companion case to the same effect, Hardin v. Jordan, 1891, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428.
Another federal case of interest here is that of United States v. State Investment Co., 1924, 264 U.S. 206, 44 S.Ct. 289, 68 L.Ed. 639. The Supreme Court, reviewing a quiet title suit which had been decided adverse to the United States, found that the decision of the circuit court of appeals sustaining decree favoring defendant was correct. There a large strip of land claimed by defendants through patent issued in 1876, was also claimed by the United States pursuant to subsequent survey. The findings of the lower court, although extending the lines farther south and west than the distances called for in the survey, were held not to involve any erroneous application of law.
Several related cases were reviewed by the United States Supreme Court in United States v. Lane, 1923, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448. Again, the rights of the original patentees were sustained. Plaintiff in all the suits was the United States. The purpose of the litigation was to establish in the government claims to title to various parcels of land lying along the border of Ferry Lake, a navigable body of water in Louisiana. The federal government claimed gross error of the original survey. Defendants in the respective cases argued that the government had long since conveyed by patents to private persons fractional subdivisions represented on the official plat of the government survey, or the Warren survey of 1839, as being bonded on the lake side by the waters of the lake and that the United States consequently had divested itself of whatever title it originally had. The government in 1916-17, after the hitherto relatively worthless lands had become valuable for oil and gas deposits, caused a new survey to be made. That survey showed the meander line to conform approximately to the sinuosities of the shore, though running for short distances inland in certain areas and short distances into and through the water in others. The acreage stated in the Warren survey as compared to the new survey had been less as to the lands involved in the various suits, with considerable acreage shown by the new survey as lying between the original meander line and the lake shore. The court quoted with approval from the Mitchell v. Smale case and concluded that the cases fell fairly within the rule there enunciated and not within the exception to the rule. Failure to run the lines with more particularity was considered to be not unreasonable, *743 in view of the wildness and remoteness of the lands, their comparative worthlessness, and the difficulties surrounding the work of the surveyors. The claims of the United States to the various parcels of land involved were rejected. See also the Florida cases of Kelsey v. Lake Childs Co., 1927, 93 Fla. 743, 112 So. 887; Lake Childs Co. v. Kelsey, 1931, 103 Fla. 590, 137 So. 690; Bishop v. Johnson, Fla.App. 1958, 100 So.2d 817; Calder v. Hillsboro Land Company, Fla.App. 1960, 122 So.2d 445. Cases from other jurisdictions are Schultz v. Winther, 1960, 10 Wis.2d 1, 101 N.W.2d 631; Anderson v. Trotter, 1931, 213 Cal. 414. 2 P.2d 373; Missouri Pac. R. Co. v. Sale, 1939, 197 Ark. 1111, 127 S.W.2d 133; See Ben Realty Co. v. Gothberg, 1941, 56 Wyo. 294, 109 P.2d 455.
It is clear that, under the authorities and under the circumstances, the natural boundary and not the meander line controls. In the light of this, the question of accretion will be looked to. Again, conflicting evidence was introduced as to whether or not accretion produced additional lands involved in the 386 acres and as to the time when such accretion occurred.
The rule as to accretion is that title to land formed along navigable waters by accretion or reliction is vested in the owners of abutting upland property. Mexico Beach Corporation v. St. Joe Paper Company, Fla.App. 1957, 97 So.2d 708. Under the holding of the chancellor the original grantees in the chain of title of appellee owned to the high water mark of the Peace River; it follows under the law that title to any accretion occurring since then would accrue to appellee.
The conjunction of these two factors, the tolerated differential between the meander line and the river shore together with the accretion since 1849, could account for the existence of the disputed 386 acres.
A subsidiary point raises the defense of estoppel because of the manner in which appellee cleared his title to the lots in which the United States asserted an interest; but the chancellor found it not to be appropriate:
"That the plaintiff at no time acknowledged the validity of the United States Government Dependent Resurvey and Extension Survey, approved April 17, 1942; nor did defendants establish that they acted in reliance on any act of the plaintiff; further, defendants failed to establish that they were induced to act or change their position injuriously as a result of any action by the plaintiff * * *"
We concur in his conclusion.
A procedural matter raised assigns as reversible error on the part of the trial judge his denial of appellants' motion seeking dismissal of the cause for lack of prosecution. Section 45.19, Florida Statutes, F.S.A., provides that actions at law or suits in equity shall be deemed abated for want of prosecution and shall be dismissed when it does not affirmatively appear from some action taken by filing of pleadings, order of court, or otherwise, that the same is being prosecuted, for a period of one year. The motion made by appellants was of a general nature, setting out merely that they moved the court to dismiss the cause in that it affirmatively appeared that no action had been taken by filing of pleadings, order of court, or otherwise, for a period of more than one year. This point is advanced upon the basis that from the time of the filing by appellee of his motion to dismiss the United States as a party defendant on November 4, 1958, to the filing by appellants of their motion to dismiss on November 18, 1959, there was no action taken.
We note that a mandate is laid down in the statute for an affirmative showing that certain steps had been taken in the litigation within the prescribed statutory period. However, there is the non-specific category set out in the statute as reflected by the language "or otherwise." The statute *744 now requires notice to be given of the hearing upon the motion.
The chancellor conducted a full hearing upon the matter, and after argument, determined that the motion should be denied. Appellee, in his brief, stated that present counsel for the State was not in attendance at the hearing but that the negotiations with the United States which had been in process were explained to the court by prior counsel for appellee in the presence of all counsel, including the then attorney for the trustees. It was pointed out, he said, that these negotiations had come to fruition with a settlement being reached.
Of course, what counsel has said in his brief cannot be considered as evidence on the point raised. However, it was not until after the trustees' motion was filed that the record reveals the negotiation referred to, its settlement through appellee's payment of $5,872, and the replacement of appellee's attorney by his present counsel. The movants were the trustees. There is nothing in the record to show what actually was before the chancellor at the hearing on the motion to dismiss nor what transpired there. The chancellor's order comes to us with the presumption of correctness. We cannot therefore say that what was presented at the hearing was inadequate to support his denial of the motion. We are not concerned with a motion to dismiss for want of prosecution, granted by the court and followed by an order of reinstatement. The language of the statute, "or otherwise," creates a category under which the chancellor could have had evidence submitted that would justify his decision.
In summary, the natural boundary and not the meander line controls; and even though there may be a variance or discrepancy of some proportions between the meander line and the shore marking the natural boundary, this does not necessarily constitute gross error amounting to fraud upon the government. Under the conflicting evidence, it cannot be said that the chancellor erred in finding that the original meander line run by Irwin in 1849 was not so grossly erroneous as to amount to a fraud upon the government. The evidence as to whether or not accretion produced additional lands and as to the time when such accretion happened was in conflict. The chancellor determined that the Peace River, since 1849, has constantly shifted. The disparity depicted by the dependent resurvey between the meander line and the shore of Peace River could be accounted for by accretion caused by the action of the river. As stated, however, a variance or discrepancy of some extent does not necessarily mean that the survey was in such gross error as to constitute a fraud upon the government. From our study we cannot say that the lower court in its capacity as determiner of fact committed reversible error. The decree is accordingly affirmed.
Affirmed.
ALLEN, Acting C.J., and SMITH, J., concur.

ON PETITION FOR REHEARING
PER CURIAM.
The petition for rehearing is directed primarily to the upholding by this court of the chancellor's order denying appellants' motion to dismiss for lack of prosecution. Appellants' premise is that this court evidently presumed the trial court had been advised of settlement negotiations in progress between appellee and the United States and therefore the lower court may have had before it sufficient "evidence" upon which it could have predicated its order.
It was not intended to convey the impression assumed by appellants; we believe a reading of our opinion demonstrates a misunderstanding as to this on their part. We simply recounted the gist of what appellee had attempted in his brief to bring before this court on the appeal with reference to the negotiations and settlement mentioned, *745 specifically pointing out in this connection, "Of course, what counsel has said in his brief cannot be considered as evidence on the point raised." This we followed with the factual comment, "* * * it was not until after the trustees' motion was filed that the record reveals the negotiation referred to, its settlement through appellee's payment of $5,872, and the replacement of appellee's attorney by his present counsel." Then we made the clear and direct observation, "There is nothing in the record to show what actually was before the chancellor at the hearing on the motion to dismiss nor what transpired there." Reiterating, we concluded, "We cannot therefore say that what was presented at the hearing was inadequate to support his denial of the motion." Even were it assumed that the chancellor did consider the negotiations for settlement and the change of attorneys, yet it could not be assumed, in the face of the silent record, that there were presented to the chancellor no other circumstances which materially entered into his decision; nor could it be assumed for purposes of consideration what those circumstances might have been. Appellants have produced nothing as to the hearing but indicate only that the last paper filed by appellee was on November 4, 1958. However, there is also the non-specific category appearing in the statute through the words, "or otherwise," upon which the chancellor could have based his order.
Appellants have also assumed, because of a statement in this court's opinion that we were not concerned with a motion to dismiss granted by the court and followed by an order for reinstatement, that this court failed to consider the good cause requirement. Such was not intended; the statement mentioned was only a part of our analysis of the situation which we were called upon to consider. As opposed to the status of the record here, an order for reinstatement would appear to emanate from petition upon good cause shown to the court pursuant to the statutory requirement.
The movants before the chancellor were the appellants; they are the appealing parties here. The ruling of the chancellor, on the appeal, is presumptively correct; it devolves upon appellants to make error clearly to appear; and it was their obligation to produce for consideration by this court an adequate record upon the subject of the error complained of. Robinson v. Foland, Fla.App. 1960, 124 So.2d 512; Broward County Port Authority for Use and Benefit of v. F.M. Rule & Co., Fla. App. 1960, 119 So.2d 82; Greene v. Hoiriis, Fla.App. 1958, 103 So.2d 226. We re-emphasize that the record is wholly devoid of anything to show what eventuated at the hearing before the chancellor.
It is additionally asserted that this court failed to consider that the action brought constituted a collateral attack upon a federal survey and as such could not lie. This position is not tenable. As we said in our opinion, appellee sought his relief under the original survey, urging that the patent of 1856 was controlling, that after the transfer which it made the federal government then had no undisposed of lands to resurvey in the sections involved, and that the patent issued pursuant to the resurvey attempted to impair appellee's vested rights gained under the original survey. We indicated in our opinion authorities which refute the position of appellants. Although the government has the unquestioned right to make new surveys, nevertheless, where it has already parted with the title, a new survey does not preclude a prior purchaser from asserting whatever title he had acquired as against one claiming under the new survey. Greene v. United States, 5th Cir.1921, 274 F. 145.
No complaint whatever is directed against this court's decision on the merits of the cause.
The petition for rehearing is denied.
ALLEN, Acting C.J., and KANNER and SMITH, JJ., concur.