**Marty KELLER, et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 5–83C.**

United States Claims Court.

Nov. 26, 1984.

Alan H. Bucholtz, Denver, Colo., for plaintiff.

Joseph T. Casey, Jr., Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. Marla Mansfield, Dept. of the Interior, Denver, Colo., of counsel.

## OPINION

NETTESHEIM, Judge.

After trial the court found and concluded that plaintiff Marty Keller, his wife Florence E. Keller, and the Kellers' other partners ("plaintiffs") in a land ownership venture called Last Dollar Associates had failed to establish by a preponderance of the evidence the existence of a contract whereby defendant, through the Forest Service of the United States Department of Agriculture, agreed to perform an independent resurvey of plaintiffs' property.

Mr. Keller had contributed money for a resurvey described in an August 29, 1972 letter from an agent of the Forest Service (the survey to be performed by the Department of the Interior, Bureau of Land Management), as follows: "The survey will probably be an independent resurvey with all private land being tracted and section and ¼ corners being brass capped." An independent resurvey entails tracting, or running a metes and bounds description, of private lands as they were originally sold by the Government. Capping of section and quarter corners would be accomplished as part of either a dependent or an independent resurvey. Mr. Keller, who did not know what the term "independent resurvey" meant, thought that tracting signified "putting a mark of some kind, an official mark at each corner of our piece of land." He knew what section corners were.

Overall, Mr. Keller's understanding of the quoted language in the August 1972 letter was that the Government undertook to survey his property in the same manner

as if a private engineer were engaged to do the job. This view was not supported by plaintiffs' expert private surveyor. The court found that Mr. Keller lacked sufficient understanding of the elements of an independent resurvey to support the reasonableness of his interpretation of the contract terms. Given that defendant admitted that it had contracted to resurvey plaintiffs' property, it was also concluded that the word "probably" reserved to the Government an option to vary performance.

The issue to be decided after post-trial submissions is whether defendant reasonably determined to perform a dependent resurvey and in the process to abandon the independent survey already commenced, including the obliteration of some, but not all, of the monuments set during the independent resurvey.

## FACTS

Plaintiffs' property, which had never been surveyed privately, consists of approximately 200 acres of mostly mountainous land in sections 19 and 30, Township 43 North, Range 9 West of the New Mexico Principal Meridian ("T.43N., R.9W., N.M.P.M.") in the Telluride, Colorado area. In late 1970 the Forest Service requested that the Department of the Interior's Bureau of Land Management (the "BLM") undertake a cooperative resurvey of certain lands in the Telluride area, including part of plaintiffs' property. A July 18, 1982 letter from the Forest Service indicates that the purpose of the resurvey was "to identify both private and forest lands in the Telluride area." A cooperative resurvey involves contribution by private landowners to defray the costs of resurvey work initiated at the request of private landowners and a government agency (here the Forest Service), the principal cost being borne by the Government. In this case the private landowners were asked to contribute a mini-

mum of $16,000, of which plaintiffs paid their share of $480.00.

The *Manual of Instructions for the Survey of the Public Lands of the United States,* published in 1973 by the BLM [hereinafter cited as the "Manual"], is recognized by the BLM as the Bible of government resurveys and conceded by plaintiffs' expert as governing what type of resurvey should have been performed. A resurvey is an attempt to retrace the prior official survey. In pertinent part the Manual provides:

> Government resurveys involve considerations of a different character from those relating to original surveys. The object is two-fold: First, the adequate protection of existing rights acquired under the original survey in the matter of location on the earth's surface, and second, the proper marking of the boundaries of the remaining public lands.

Manual, ch. VI, § 6–2.

According to chapter VI, section 6–4 of the Manual, a dependent resurvey differs from an independent resurvey in that the former retraces and reestablishes the lines of the "original survey in their true original positions according to the best available evidence of the positions of the original corners." In other words, the corners and quarter corners are located and monumented. An independent resurvey, on the other hand, involves the establishment of new section lines independent of and without reference to the corners of the original survey. Manual § 6–5. A dependent resurvey does not locate the boundaries of patented lands, or those lands originally alienated from the Government to private landowners. An independent resurvey tracts patented lands (by a metes and bounds description) and monuments accordingly within sections and quarter sections, although, in doing so, an independent resurvey cannot vary the boundaries of patented lands.[1] From plaintiffs' perspective

---

1. Manual, § 6–42 provides in pertinent part:
   The jurisdiction of the Bureau of Land Management, the limit of the authority of the surveyor, and the bona fide rights of claim-

ants, where entered or patented lands are involved [those purchased originally from the Government], *remain absolutely the same*

an independent resurvey would have been much more valuable than the dependent resurvey actually completed, because the additional brass caps marking patented land in an independent resurvey would provide markers proximate to plaintiffs' property line (even if the patented land is not coterminous with plaintiffs' property) and thereby reduce substantially the cost of a private survey.

Although the BLM survey team was present in the Telluride area before September 1972 performing investigative work leading to an independent resurvey, it was not until August 5, 1975, that the BLM's Office of Cadastral Survey proposed special instructions providing for an independent resurvey of the south and west boundaries and a portion of the subdivisional lines in T.43N., R.9W. The BLM's regional office approved the proposal on August 11, 1975. The August 5 recommendation recapitulated the efforts of the Office of Cadastral Survey to verify the last official survey of T.43N., R.9W., which was conducted by William H. Clark in 1882. The recommendation concluded:

> After a careful review of all survey records, local surveys, and interrogation of local residents and several surveyors, it was concluded the Clark survey was probably either fictitious or subject to even greater distortion than indicated on the official plat....
>
> An extensive retracement of the Clark survey has been made and diligent search for evidence thereof failed to produce any authenticated corners.... There are no fences or property corners which appear to have been established at original survey monuments....
>
> After evaluation of all data obtained which would dictate appropriate methods of resurveys there is one obvious conclusion. The survey of Clark in 1882 is literally nonexistent.... The complete dissimilarity between the survey record and the actual field conditions has been

*whether the resurvey is to be made upon the dependent or independent plan....*

recognized since the date of the first surveys in the area....

\* \* \* \* \* \*

> The survey is either fictitious or totally obliterated. The corners thereof have not been found and *what claims that are dependent on the public surveys have been located at record positions rather than by any actual dependent resurvey.*

(Emphasis added.)

The survey team was instructed to protect by metes and bounds surveys "[a]ll patented or valid entries whose descriptions are based on the subdivisions returned in the Clark survey," which included plaintiffs' property located in sections 19 and 30 of T.43N., R.9W. Pursuant to these instructions, the patented land in these sections was to be tracted based on the metes and bounds descriptions. The tracts would not necessarily coincide with plaintiffs' property, but the tract monuments would be additional monuments from which the boundaries of plaintiffs' land could be fixed more easily.

Although plaintiffs did not have a reasonable expectation of the nature of the cooperative resurvey that the Government "probably" would provide, the BLM formally undertook an independent resurvey pursuant to the August 5, 1975 recommendation. During 1975 the BLM's Colorado State Office was surveying in T.43N. R.10W. (to the west of R.9W.) and discovered evidence of the original survey in the east of T.43N. R.10W. As a result, the August 5, 1975 Special Instructions were amended on November 12, 1975, approved November 25, 1975, to call for performance of a dependent resurvey of the line between T.43N., Rs.9 and 10W. (the west boundary of T.43N. R.9W.). However, the amended Special Instructions provided:

> This procedure will have no effect on the proposed surveys in T.43N., R.9W. The survey by Clark, in 1882, which is grossly distorted and wholly unrecovera-

(Emphasis added.)

ble and at variance with all other surveys in the area ... will be treated as set forth in the Special Instructions dated August 5, 1975.

The survey team therefore continued its work on an independent resurvey in the interior of T.43N., R.9W., but located no evidence of the Clark survey within the interior. At some point the BLM survey team also retraced the south boundary between T.43N. R.9W. and T.42N. R.9W. and located at least the southwest corner of T.43N. R.9W. It is not clear whether this finding predated the November 12, 1975 amendments.

Work on the independent resurvey proceeded apace during the six months per year that the weather allowed, but after an inspection trip on May 17–18, 1976, to review the survey work, the BLM on May 20 ordered that both the south and west boundaries of T.43N. R.9W. be traced by dependent resurvey:

> The independent resurvey already executed in the field will be totally abandoned and all corners set and marked, along with accessories, for the independent resurvey will be removed....

> Even though considerable funds and manpower have been expended to date in this township, the Washington Office does not feel this constitutes a valid reason for completing the project in a manner unacceptable to them.

On June 16, 1977, approved on June 21, 1977, the Special Instructions were amended for the second time consistent with the May 20 directive.

With respect to plaintiffs' property in section 19, all four of the monuments that would have been set regardless of whether the resurvey was independent or dependent were set and remain.[2] All the section and quarter sections in section 30 were monumented under the dependent resurvey. Af-

ter abandonment of the independent resurvey, several monuments that had been set pursuant to the independent resurvey of the interior of section 30 were removed and five others that would have affected plaintiffs' property were not set. It is unnecessary to make findings as to whether plaintiffs would be entitled to damages of $13,-800, as they contend, for the cost of restoring and completing the independent resurvey, including surveying in fence corners,[3] or to $2,550, per defendant's position, in view of the decision on liability.

## DISCUSSION

In contrast to the complex facts giving rise to this lawsuit, the legal question is relatively simple: Did the Government have a reasonable basis for abandoning the independent resurvey? Framed slightly differently, the question is whether—in light of the Manual's strictures—an independent, as opposed to a dependent, resurvey was indicated.

The Public Lands Survey Act of 1909, 43 U.S.C. §§ 751–774 (1982), limits the Government's authority to resurvey and to mark boundaries of undisposed lands to situations in which the Secretary of the Interior "after full investigation ... may deem essential to properly mark the boundaries of the public lands remaining undisposed of ...." However, "no such resurvey or retracement shall be so executed as to impair the bona fide rights or claims of any ... owner of lands affected by such resurvey or retracement." 43 U.S.C. § 772; 3 C.F.R. § 9180.0–2(b) (1983). *See generally United States v. Reimann*, 504 F.2d 135, 139 (10th Cir.1974) ("The government retains no power to nullify a [land] patent, nor the survey upon which it is based, once patent has issued.") A state intermediate court accurately described the purpose of a resurvey pursuant to section 772:

---

**2.** Two aliquot part corners (one-sixteenth sections) were monumented on plaintiffs' property in section 19. These monuments were not obliterated when the independent resurvey was abandoned because this monumentation was consistent with a dependent resurvey.

**3.** According to plaintiffs' expert, locating fence corners would not change the monumenting of section and quarter sections, although this information might be helpful in a claim of adverse ownership against an adjoining private landowner.

In making a resurvey, the question is, not where would an entirely accurate survey locate the lines, but where did the original survey locate the lines. In all cases, the original survey, wherever possible, must be retraced, since it cannot be disregarded or needlessly altered after property rights have been acquired in reliance upon it. The purpose of a resurvey is to furnish proof of the location of the lost lines or monuments, and not to dispute the correctness of the original survey or to control it.

*Trustees of Internal Improvement Fund v. Toffel,* 145 So.2d 737, 741–42 (Fla.App. 1962) (citation omitted).

Section 6–19 of the Manual states a decided preference for dependent resurveys:

In most areas that require resurveys the survey of record can be reconstructed by the methods of the dependent resurvey. The principal resurvey problem is one of obliteration with comparative absence of large discrepancies. The special instructions provide for a retracement and dependent resurvey, and these may be carried on at the same time if no complications develop. Even where the record survey proves to be badly distorted, the extent of private ownership may dictate that the resurvey will be of the dependent type.... Since an independent resurvey cannot affect boundaries of lands already alienated, it serves little purpose where every section line is the boundary of private land.

Section 6–21 of the Manual sets forth when an independent resurvey should be employed:

*Providing a large enough area of public land remains to warrant it,* the methods of the independent resurvey are employed *if there are intolerable discrepancies in the original survey.* This

occurs where the early survey was not faithfully executed with the result that some lines usually have not been established, have no actual existence, and cannot be reconstructed to conform to a fictitious record.

(Emphasis added.)

Given the foregoing statutory and regulatory framework and administrative directives, it would not be improper to put the burden on plaintiffs to show that the Government's decision was unreasonable. Nonetheless, the thrust of the Government's case was to vindicate the reasonableness of its determination because the Government elected to perform a dependent resurvey. *See* 1 *Restatement (Second) of Contracts* § 34 (1979). Several facts were adduced that support the reasonableness of the decision to proceed with the dependent resurvey. First, the Manual does not support the proposition that once an independent resurvey has been commenced, the Government is bound by the information it discloses. Section 6–21 provides:

Interested parties are to be informed that the examination is being made strictly for the purpose of developing information. They will be given to understand that, while new lines may be run later to identify the remaining public lands, the [independent] resurvey will be planned to protect all valid existing rights.

Further section 6–24 states:

During the course of a resurvey the surveyor should advise all interested parties, as occasion and opportunity allow, that the resurvey is not official or binding upon the United States until it has been duly accepted by the Director, Bureau of Land Management, as provided by law....[4]

---

**4.** Plaintiffs argue that two maps with the legends "unofficial, subject to correction and approval" and "unofficial, subject to change" that Mr. Keller examined in the field demonstrate an irrevocable election of performance or that they somehow estop defendant to deny that the election to proceed with an independent resurvey was cast in concrete. The language of Manual

§ 6–24 undermines plaintiffs' argument, and plaintiffs cannot show that an authorized official made a binding election. *See City of Alexandria v. United States,* 737 F.2d 1022, 1027–28 (Fed.Cir.1984) (discussing *Manloading & Management Assoc. v. United States,* 198 Ct.Cl. 628, 461 F.2d 1299 (1972)).

Secondly, approximately 75 percent of the land resurveyed is held by private landowners. The purpose of the authorizing statute is to resurvey government lands. *See* 43 U.S.C. § 772; 43 C.F.R. § 9180.0–2(b). Thirdly, during the years in which work on the independent resurvey proceeded, the survey work to the west and evidence confirming the original survey as to points on the south boundary produced enough evidence to permit retracing the west boundary and later the south.

Defendant offered no convincing evidence as to why much of the work on the independent resurvey was obliterated as part of its abandonment of that resurvey in 1977. The inference is not implausible that the evidence was removed in order to avoid confusion. Unless the Government was obligated to perform an independent resurvey, however, defendant was not required to leave such monuments in place. This is so even though plaintiffs were confused by the BLM's actions and even though leaving in place more of the monuments that had been set, rather than destroying them, would have benefited plaintiffs by reducing the cost of a private survey.

Plaintiffs' expert witness Gerard H. Pesman was a local private surveyor. As the court stated at trial, the differences in the testimony of plaintiffs' expert, an individual highly qualified by education and experience in the private sector, and defendant's experts, employees of the BLM who learned about government surveys largely on the job and who, unlike plaintiffs' expert, had extensive experience in the conduct of government resurveys, could not be resolved based on credibility. Mr. Pesman testified that because the Clark survey was completely unreliable, an independent resurvey was called for under the terms of the Manual. His view is not supported by section 6–21 of the Manual, which requires more than "intolerable discrepancies in the original survey": A "large enough area of public land [must remain] to warrant [an independent resurvey]."

One of defendant's experts agreed that no evidence at all was found of the original survey within T.43N., R.9W. However, the absence of monuments in the interior of the township did not require an independent resurvey. According to Marlin Livermore, the BLM's Chief, Projects Section, Colorado State Office, Branch of Cadastral Surveys, the BLM has performed many dependent resurveys in such circumstances. All that is required is to find an original corner of the township or section ("an original survey point") and thence to tract the original survey by working from the original surveyor's field notes in order "to recreate the original survey on the best available evidence at that point." That both plaintiffs and defendant concur that the Clark survey should be discredited thus does not of itself support the contention that completion of an independent resurvey was mandated.

The record supports a finding that BLM officials in Denver, Colorado, and Washington, D.C., were nonplused that an independent resurvey had been proceeding in the field and put a halt to its completion. Consistent with section 6–19 of the Manual, an independent resurvey is performed so rarely that another government expert, Kenneth Witt, Mr. Livermore's supervisor, recalled that within the last five years only four or five plats out of 215 resurveyed had been suspended, *i.e.*, cancelled or retraced by independent resurvey. Mr. Livermore testified that over his 20 years' experience he has been involved in making only two decisions to undertake independent resurveys.

Unhappily for plaintiffs, when the Government became aware that an independent resurvey was being performed, an abrupt end was put to that resurvey, even though one of defendant's experts testified this was the first occasion in which field work for a independent resurvey has been abandoned. However, it would have been inconsistent with the mandate of the Department of the Interior to continue with an independent resurvey when a dependent resurvey was more appropriate. The Government may have acted late, but that

does not in itself render the Government's determination unreasonable.

Given that the purpose of a resurvey is to resurvey government lands, that the lands in the interior of section 30 were mostly private, that an independent resurvey could not have changed the boundaries of patented lands, and that the west and south boundaries of the township were located based on field work before completion of the independent resurvey, the fact of the commencement of an independent resurvey is not significant. Once the BLM was in a position to retrace at least the west boundary of the original survey, halting the independent resurvey was more reasonable than proceeding with a method that was not necessary to achieve the end of resurveying public lands. The court has already found and concluded that, assuming the Government's decision was reasonable, plaintiffs have received the full measure of contract performance.

## CONCLUSION

Based on the foregoing, judgment shall enter for defendant, and the Clerk of the Court shall dismiss plaintiffs' complaint.

IT IS SO ORDERED.

Costs to the prevailing party. 28 U.S.C. § 2412(a) (1982); RUSCC 54(d).